(No. 63753.—)

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. THOMAS V. ODLE, Appellant.

*Opinion filed December 21, 1988.—Rehearing denied May 26, 1989.*

Theodore A. Gottfried and Gary S. Rapaport, of the Office of the State Appellate Defender, of Springfield, and Ann Bodewes, law student, for appellant.

Neil F. Hartigan, Attorney General, of Springfield (Shawn W. Denney, Solicitor General, and Terence M. Madsen and Nathan P. Maddox, Assistant Attorneys General, of Chicago, of counsel), for the People.

CHIEF JUSTICE MORAN delivered the opinion of the court:

Defendant, Thomas V. Odle, was charged by information in the circuit court of Jefferson County under section 9—1(a)(1) of the Criminal Code of 1961 (Ill. Rev.

Stat. 1985, ch. 38, par. 9—1(a)(1)) for the murders of Robert, Carolyn, Sean, Robyn and Scott Odle. A jury found defendant guilty of all five murders. The State requested a hearing to consider whether the death penalty should be imposed. (Ill. Rev. Stat. 1985, ch. 38, par. 9—1(d).) Defendant waived a jury, and the trial court found defendant eligible for the death penalty. After hearing evidence in aggravation and mitigation, the trial court sentenced defendant to death. The death sentence was stayed (107 Ill. 2d R. 609(a)), pending direct appeal to this court (Ill. Const. 1970, art. VI, §4(b); 107 Ill. 2d R. 603).

The issues presented for review are: (1) whether the trial court erred in denying defendant a surrebuttal closing argument at the guilt phase of the trial; (2) whether the prosecutor's statements during closing argument denied defendant a fair trial; (3) whether the trial court's reference to a New York case defining "extreme mental and emotional disturbance" demonstrates that it adopted too strict a definition of this mitigating factor at the sentencing phase; (4) whether the trial court's consideration of evidence and adjudications from juvenile court proceedings violated defendant's rights under the Juvenile Court Act; (5) whether there are sufficient mitigating factors to preclude imposition of the death penalty. Defendant also asks that we reconsider prior cases holding the Illinois death penalty statute constitutional.

On Friday, November 8, 1985, officers from the Mount Vernon police department and the Jefferson County sheriff's office discovered the dead bodies of defendant's father, mother, two brothers and sister in the family residence. Defendant became the prime suspect in the investigation of the murders, and was apprehended the next morning. Defendant was read his *Miranda* rights and waived his right to have an attorney present during questioning. During questioning on the

day after the murders, he made an oral statement in which he confessed to the murders. The confession was tape-recorded and later transcribed.

Defendant's tape-recorded confession as well as the transcript of the confession were admitted into evidence at trial. In that confession, he recounted the events surrounding the murders. He stated that on November 8, 1985, he awoke at approximately 9:30 a.m. He was alone in the house except for his father, Robert Odle, who was in the kitchen. After smoking a cigarette and taking a shower, he went into the kitchen to find something to eat. Before returning to his bedroom, he removed a butcher knife with a five- to six-inch blade from a rack in the kitchen. A few moments later, he placed the knife in his pants, placed the lower portion of the shirt he was wearing over the knife, and reentered the kitchen. Defendant then stabbed Mr. Odle with the knife on the right side of the throat. Mr. Odle attempted to reach for the phone but defendant waved him off with the knife and told him to stay away from the phone. Mr. Odle sat down in a chair in the kitchen and defendant stabbed him in the left side of the neck and in the stomach.

Defendant stated that his mother was expected to return home at approximately 11:30 a.m. He dragged his father's body into the bathroom, laid towels on the floor to cover the trail of blood his father's body left, and used a mop and cleaner to remove the remaining blood before his mother returned.

Defendant stated that when his mother, Carolyn Odle, returned home, he hid behind the back door and stabbed her as she walked into the house. Mrs. Odle ran into the living room while defendant continued to stab her. He maneuvered her toward his parent's bedroom and told her to "look at Dad." Mrs. Odle fell to the floor, and he placed her body on the floor at the foot of his parents' bed.

Defendant removed the clothes he was wearing, washed them, and changed into another set of clothes. Defendant stated that at approximately 12 p.m., he drove to the high school to see his girlfriend, Theresa Blevins. He returned home at approximately 2 p.m., removed the blood which remained on the television, refrigerator, floor, table and chairs, and watched television.

At 3:10 p.m., his brother Scott, age 11 years, came home. When Scott asked him about some blood marks on the walls, defendant told him that it was paint. When Scott asked further questions, he told Scott their parents had left for the weekend. He then told Scott to go into the back bedroom that he and Scott shared with their brother Sean. When they reached the bedroom, defendant began to strangle Scott with his hands. Defendant stated that at this point his hands became tired. He then tied a pajama bottom around Scott's neck and continued to strangle him. Defendant dragged Scott's body into his parents' bedroom and laid him next to Mrs. Odle.

Defendant further stated that because his mother usually drove his brother Sean and his sister Robyn home from school at 3:30 p.m., he picked them up. When they returned home, defendant blindfolded Sean, took him into the bedroom where their mother and brother lay, and tied his hands behind his back with a towel. Defendant stabbed Sean in the throat three times, and then stabbed him in the cheek and head. Defendant left the room to get his sister but heard noises in the room he had just left. Realizing that Sean was still alive, defendant returned to the room and again stabbed Sean in the head and the back of the neck.

Defendant stated he then changed back into the blue jeans he had washed earlier that day, changed his shirt, and went to get his sister Robyn. He told her to come to the bedroom which contained the bodies of their two

brothers and their mother, held his hand over her eyes as they entered the room, and told her he had a surprise. Defendant then uncovered her eyes, showed her the bodies of her mother and her brothers, and stabbed her in the neck four to five times and once in the side.

Defendant stated he noticed he had blood all over him. He also noticed that he had cut his hands when they slipped off the handle of the knife and onto the blade while stabbing the victims in the head. He washed himself in a sink, changed clothes, locked up the house, took his father's car and drove around for about an hour. He then picked up Theresa Blevins at a gas station near the high school. Defendant stated they went to a motel room where they spent the night.

When asked if he had told Blevins anything about the incident, he said he had not. He stated that the first Blevins heard of the incident was when she called a friend from the motel room the morning after the murders, and was told the police were looking for defendant because he was suspected of having murdered a family of five. Defendant stated he "told her she was crazy."

Upon further questioning, defendant said that he and his parents had argued the day before the murders. When asked what he and his parents had argued about, defendant replied they argued about "every day nonsense. *** They bitched at me for every little thing I did. I look at them wrong. What are you looking at me like that for? Constantly jumping on [sic] my throat. Constantly, constantly pressuring me." When asked how long this had occurred, defendant replied, "Years." Defendant stated that his parents had told him he had to "find another place to live" by the time his father left for work the next day at 4 p.m.

When asked why he had killed his siblings, defendant stated that once his parents were dead, there was no one to take care of the children. When asked if the chil-

dren could have lived with relatives, defendant stated the children "would find [Mr. and Mrs. Odle] and they would run and tell." In response to an officer's question regarding what defendant planned to do after leaving the motel room, defendant said he was going to "just drive" and "[f]ind a pole to hit or something."

The testimony adduced at trial reveals the following. Dr. Richard Garretson, the Jefferson County coroner, testified on behalf of the State. His testimony concerned the condition of the victims when found and the manner in which they died. Dr. Garretson testified that Scott's neck had been compressed to the size of an adult man's wrist. In contrasting Scott's strangulation death from the stabbing deaths of the other victims, Dr. Garretson stated that "it's a suffocation death even though we call it immediate on the coroner's death certificate. It takes minutes for somebody to die. That would be [a] very agonizing death."

Defendant's friends, Larry Owens, Kim Cates and Theresa Blevins, testified at trial on behalf of the State. Their testimony indicates that they were with defendant at various times during the day of the murders, and that a few days before the murder, defendant told them Mr. and Mrs. Odle were going out of town for the weekend and that his brothers and sister were going to spend the weekend at his grandmother's house.

Owens also testified that on the day of the murders he telephoned the defendant's house at approximately 9:30 a.m. and received a busy signal. He stated that he eventually reached defendant, and that defendant was breathing hard when he answered the phone. When he asked defendant what was wrong, defendant answered that he had spilled some red paint on the hallway carpet and wanted to clean it up before his father returned. When defendant asked Owens if he wanted to drive around with him, Owens said he would. Owens then

drove to defendant's house along with his girlfriend, Kim Cates.

When they reached defendant's house, they sounded the car horn and defendant emerged from the house. Defendant told them to park their car at the city park and he would pick them up. Owens stated he and his girlfriend drove to the park and defendant picked them up in Mr. Odle's car. Defendant told Owens that his father and mother had gone for the weekend, leaving him the car.

Owens further testified that they drove to the high school and met Theresa Blevins there between 11:30 a.m. and noon. He stated that when Blevins mentioned to defendant that he had some blood on his neck, defendant looked in the rear view mirror of the car and wiped off the blood. He stated that after Blevins went back to school, they went riding around in the car. Owens stated that while they drove defendant asked him if he could ever kill anyone. Owens testified that he "confronted [defendant] about it"; however, defendant did not respond.

Owens testified that defendant called him later that day at approximately 4 p.m. or 4:30 p.m., and asked him if he wanted to go riding around again. Owens stated he and Cates went riding with defendant and picked Blevins up at a gas station. He stated that they visited Owen's brother, who was staying at a local motel, where they talked for approximately 30 minutes and left. Defendant then drove them to another motel and rented a room. Owens stated that all four of them went into the motel room and stayed there until defendant drove him and Cates back to Cates' house at approximately 9:30 p.m.

Owens' girlfriend, Kim Cates, also testified on behalf of the State. Her testimony substantially corroborated Owens' testimony. In addition, Cates testified that when

defendant picked them up in the afternoon, she noticed defendant had two cuts on his left hand and one on his right hand. When she asked defendant where he had received the cuts, she testified defendant told her he had slammed his left hand in the car door. Defendant did not explain the cut on his right hand.

Theresa Blevins testified on behalf of the State. Blevins' testimony corroborated Owens' and Cates' testimony regarding their activities on the day of the murders. In addition, Blevins testified that a few days before the murders she and defendant made plans for the weekend to spend the night together at defendant's house or a motel.

Blevins further testified that when she met defendant, Owens and Cates at the gas station, she noticed that defendant had blood streaks on the inside of his right arm from his wrist to his elbow. Blevins testified that she did not ask, nor did defendant say how the blood got on his arm.

Blevins stated that she and defendant spent the night together at the motel. Blevins testified that the next morning, she telephoned a friend from the motel and was told that defendant was on the news regarding the murder of a family. Blevins testified that she laughed and told her friend that she would go to the police station and "straighten everything out." When she hung up the phone and related the story to defendant, his reaction was "[r]eally, wow." Blevins stated that defendant told her he would go to the police station and "straighten everything out" after he dropped Blevins off at her friend's house.

Blevins described defendant as a quiet person, but indicated that defendant was more so on the day of the murders. Blevins testified that defendant acted the same way at noon that day as he did later in the second motel.

Blevins stated that as far as she knew, defendant did not have trouble sleeping that night.

Yvonne Sexton, a friend of Mrs. Odle, testified on behalf of the State. She testified that on the day of the murders she went to the Odle home to show something to Mrs. Odle. She stated defendant came out of the house and told her Mrs. Odle had left with a woman in a green car. She testified defendant was calm and friendly when she spoke with him.

Kim Twiggs testified she overheard a conversation defendant was having with another person in the city park two days before the murders. She stated that defendant said he was going to have the family car that weekend and that there was going to be a party at his house.

The defense raised at trial was insanity. In support of his theory, defendant presented a substantial amount of testimony from friends, neighbors, and family counselors and Department of Children and Family Services (Department) employees. Some of the Department employees had counseled the Odle family after they had received reports that the family was physically and emotionally abusing Sean. Other employees were called to testify concerning the Department's actions after the filing of a juvenile proceeding in which defendant was adjudicated delinquent for one count of felony theft, four counts of residential burglary, and one count of attempted residential burglary. All of the witnesses were called to either describe the Odle family and its members, the parents' treatment of the Odle children, or defendant's drug use.

Dr. Henry Conroe, a psychiatrist, testified on behalf of defendant. He was unable to render an opinion as to defendant's sanity on the day of the murders because three questions, which he stated were essential to the diagnosis, remained unanswered after his review of the

defendant's records and his interview with defendant. First, he was unable to determine why defendant murdered his father and his brother, Scott, while expressing considerable affection for them during their interview. Second, he stated he was unable to determine why defendant continued to murder his family while feeling nauseated and repulsed during the slayings. The third question which remained unanswered was what defendant tangibly hoped to gain from the murders.

Dr. Conroe testified that during their interview, defendant expressed fondness for his father but felt Mr. Odle was "unavailable" and passive. Defendant described his mother as being two different people, in that she was active in the community yet very violent and physically and emotionally abusive toward her children.

Dr. Conroe testified that the collateral sources he reviewed corroborated defendant's characterization of Mrs. Odle. He testified that there was evidence that Sean had been chained to his bed at night, and that when Mrs. Odle struck the children with a belt to discipline them she was unable to stop herself at times. He also testified that when defendant was younger Mrs. Odle had smashed his head against a wall and that Sean had told Department of Children and Family Services employees that Mrs. Odle had "taken a hammer to" defendant, used a dog chain to tie defendant to his bed at night, and restricted defendant to the yard when playing with friends until he was 15 years old.

Dr. Conroe stated that during their interview, defendant stated that he felt his mother was overly harsh, punitive and restrictive; however, defendant also cited instances in which Mrs. Odle left the children alone while Mr. Odle worked. Defendant told Dr. Conroe that he suspected Mrs. Odle was seeing other men at these times.

Dr. Conroe also stated that just prior to the murders, defendant had been discharged from the military in June

of 1985 because of a knee injury. Upon returning home, he was unable to find work, broke up with a girlfriend, and was subjected to constant friction between himself and his family. He testified that defendant became depressed and suicidal. According to Dr. Conroe, defendant began to think about killing his parents the day before the murders, when he was told he was being evicted from the family home.

Dr. Conroe stated that in his opinion defendant suffers from a borderline personality disorder and mixed substance abuse. He testified there are two types of mental disorders. One type is a "psychosis where a person is out of touch with reality." The other type is a "neurosis where the person can feel a lot of inner pain yet they can be functioning pretty well on the outside." He explained that a person with a borderline personality disorder "can slip either into deep depressions or can slip into psychosis *** when they are stressed terribly, [and] can lose touch with reality for a brief period of time and then pull themselves together again."

According to Dr. Conroe, persons with a borderline personality disorder have "long-standing problems controlling their impulses, *** have difficulty controlling their anger" and "have unstable and intense relationships with other people." In his opinion, a person with a borderline personality disorder cannot tolerate being alone. He found that significant in this case because the day before the murders defendant had been told he could no longer live at home. Dr. Conroe opined that defendant's commission of these murders was the result of a "malignant family system" which exhibited "unavailability," "absence" and "coldness."

When asked if defendant could be diagnosed as having an antisocial personality disorder, Dr. Conroe testified the diagnosis would only be appropriate where the person exhibits a certain "coldness" and the commission

of antisocial acts is central to the subject's personality. Dr. Conroe found defendant did not exhibit these traits. He testified that an antisocial personality is not able to form bonds with anyone and would not have been able to demonstrate affection as defendant did for his brother Scott during their interview.

On cross-examination, the State elicited from Dr. Conroe the fact that none of the reports he received from the Department of Children and Family Services concerning the Odle family were generated in response to the family's treatment of defendant; rather, they were generated in response to the family's treatment of Sean. Dr. Conroe stressed however that the Department's actual recommendations concerned the entire family.

As to Dr. Conroe's diagnosis of defendant, he testified on cross-examination that someone with a borderline personality disorder does not generally engage in criminal behavior such as thefts and burglaries, and admitted he had reviewed police reports which indicated defendant committed some burglaries and thefts when he was 15 years old.

Defendant also introduced the testimony of Dr. Michael Althoff, a psychologist. He did not testify in order to render an opinion as to the defendant's sanity; rather, his testimony concerned defendant's motivation for committing the crimes and whether there was a relationship between the alleged physical and emotional abuse defendant suffered and his criminal behavior.

Dr. Althoff testified that there were eight psychological characteristics of an abused child and that defendant exhibits all eight of these characteristics to some degree. He testified that these factors as well as the collateral information he reviewed led him to believe defendant was an abused child.

He further testified as to defendant's motivations on the day of the murders. He stated that defendant's back-

ground as an abused child, his living in a "dysfunctional family," as well as his drug use, led defendant to have periodic thoughts of killing his family for years because defendant felt "emotionally murdered by his family at times." He testified defendant felt alienated, had a damaged sense of self and was depressed and extremely bitter. He also stated that in his opinion, defendant's act of stabbing his father unleashed the anger and hate defendant had been storing up for years, and defendant "took the power that his father never used and assumed the role of the avenger" and killed his mother. In his opinion, after defendant killed his mother, he:

"identified with her and took care of the rest of his family like he viewed his mother having taken care of him. In other words, [defendant] felt that he had been emotionally murdered, so to speak, by his mother for years. After he took her life, he acted in a way in which he viewed her. And then a—and thus the remaining homicides.

Another way of understanding that is that [defendant] felt like he needed to take care of the rest of his siblings, to protect them from the awful horror which he has previously perpetrated. Thus, the remaining homicides."

Dr. Althoff stated that in his opinion defendant suffers from mixed substance abuse disorder and mixed personality disorder with borderline antisocial features. He defined a mixed personality disorder with borderline antisocial features as "a significant disturbance concerning his relationships with others, his sense of self, his behavior and his emotions." He testified that a person with these disorders could have psychotic episodes, but the mere presence of these disorders does not mean a person is psychotic.

On cross-examination, the State attempted to demonstrate that much of the information regarding the character of the Odle family and defendant's drug use, upon which Dr. Althoff relied for his diagnosis, was derived

from defendant's own statements. For example, Dr. Althoff admitted there was "no clear, consistent evidence" from sources other than defendant that he was physically abused. In addition, Dr. Althoff's conclusion that defendant smoked one marijuana cigarette, a few marijuana cigarette butts, and one-half of a half pint of whiskey before he committed the murders was not corroborated by any collateral sources; however, Dr. Althoff stated defendant's personality was such that if he were to lie, he would probably lie in order to ensure punishment rather than to escape punishment.

Testimony was also introduced concerning defendant's drug use. Some of the witnesses testified that defendant mainly used marijuana and drank liquor, and were not of the opinion that defendant was under the influence of drugs a majority of the time. Other witnesses contradicted this testimony, indicating that defendant was a regular drug user, and that in addition to marijuana and liquor, they had either seen or defendant told them he had used other drugs such as PCP, LSD and cocaine.

The State introduced the testimony of Dr. Lawrence Jeckel, a psychiatrist. Dr. Jeckel stated defendant was not legally insane at the time of the murders. He testified that based upon his review, defendant suffers from an antisocial personality disorder. He considered other person's observations of defendant's behavior at the time of the murders to be particularly valuable given the fact he found defendant's subjective truthtelling ability suspect, and stated that the people who observed defendant on the day of the murders did not find that he engaged in any bizarre behavior, indicative of hallucinations or psychosis. He ruled out the possibility defendant suffers from a borderline personality disorder, stating defendant does not exhibit the unstable behavior, mood and self-image consistent with the diagnosis. He also

opined defendant was only an occasional or "recreational" user of drugs, and that if he did abuse a drug it was most likely marijuana.

The jury rejected defendant's insanity defense and found him guilty of all five murders. The State moved for a death penalty hearing, and defendant waived his right to a jury at the sentencing phase. Based on the evidence introduced at the eligibility phase of the proceedings, the trial court found defendant to be 18 years of age at the time of the offense (Ill. Rev. Stat. 1985, ch. 38, par. 9—1(b)), and also found defendant had been convicted of two or more murders (Ill. Rev. Stat. 1985, ch. 38, par. 9—1(b)(3)). Finally, the court found defendant had been convicted of killing an individual under the age of 12, and that the death resulted from exceptionally brutal or heinous behavior indicative of wanton cruelty. (Ill. Rev. Stat. 1985, ch. 38, par. 9—1(b)(7).) Based on these findings, the court found defendant eligible for the death penalty and heard evidence in aggravation and mitigation.

The State introduced the testimony of a friend of the Odle family who had known them for approximately two years. The witness testified about several incidents concerning defendant, most of which were gleaned from hearsay statements various Odle family members made to the witness. The witness testified that Mr. and Mrs. Odle told her defendant had stolen bicentennial collectors quarters and 15 silver dollars from the Odle home in the spring of 1985. The witness also testified defendant kicked a hole in the kitchen wall while talking on the phone, chased Sean Odle with a knife, made Sean stand up with his nose to a wall, forced his brothers Scott and Sean to steal purses from cars parked at a local church, hid his sister's lunch money, struck his grandmother, threw Mrs. Odle against a wall and stole a knife from one of his friends.

The State also introduced the testimony of several other people who were acquainted with various members of the Odle family, including two neighbors of the Odle family, and the owner and the manager of a local market. These witnesses testified regarding defendant's various acts of vandalism, theft, sale of stolen property and intimidation. The trial court indicated that it discounted much of this testimony because of its hearsay nature.

The State also introduced the testimony of a girl who claimed that when she was 13 or 14 years old, she left her home at night without her parents' permission and had sex with defendant on three or four occasions at his home. The witness claimed she continued this practice until she was caught by her parents and the police, because she was afraid of what defendant might do if she stopped. When the witness was called later to testify on behalf of the defense, she admitted writing a letter to defendant, expressing her affection for him. The letter and the witness' testimony were introduced into evidence to contradict the State's claim that their intercourse was less than consensual.

A similar act of intercourse with a minor was also introduced into evidence, without defense objection, through a transcript of defendant's testimony in a juvenile court proceeding. In the transcript, defendant admitted having sex with a sixth grade girl while he was a sophomore in high school.

The State introduced, without defense objection, the entire contents of two juvenile court files. The first file was from the juvenile proceeding adjudicating defendant delinquent for one count of felony theft, four courts of residential burglary, and one count of attempted residential burglary. The second court file was from a juvenile proceeding brought regarding Sean Odle, which contained an allegation that defendant had physically abused Sean. The file contained an order requiring Mr. and Mrs.

Odle to make reasonable efforts to prevent defendant from physically abusing Sean. Finally, the State introduced, over defense objection, photographs depicting the victims after they were slain.

In mitigation, the defense offered into evidence a letter from Dr. Althoff regarding defendant's potential for rehabilitation. The letter stated defendant is not a threat to the community at large and if defendant:

> "received appropriate treatment, if his chemical dependency problems are successfully rehabilitated and if he does not become involved in close relationships which approximate the types of relationships in his previous familiar circumstances, the likelihood of him reengaging in similar violent behavior would be acceptably low."

The defense next introduced testimony from an investigator with the Richland County sheriff's office who was assigned to the defendant's security detail during the trial. The investigator testified defendant had expressed interest in making a videotape to help other people addicted to drugs. On cross-examination the witness testified that neither the Richland County sheriff's office nor defendant had ever done any follow-up work concerning the videotape. This witness, as well as another jail employee, testified that defendant had never caused any trouble while in jail.

The next defense witness testified that he had known the defendant for three or four years. The witness testified he and a friend had purportedly observed an injury to defendant's face, and that defendant explained he had argued with his father. The witness did not describe the nature of the injury or indicate whether Mr. Odle had struck defendant, but merely stated, "[i]t didn't look in the best of health," and that he had observed defendant's face in this condition on a number of occasions. On cross-examination the witness testified he was currently in the Illinois Department of Corrections serving a sen-

tence for delivery of a controlled substance. Upon further cross-examination the witness further described the injury as red underneath defendant's eyes and that he would characterize the injury as a bruise.

As their final witness the defense called defendant's maternal grandmother. She stated that she was against capital punishment when asked whether defendant should receive the death penalty.

The court then heard the arguments of counsel and allowed defendant to speak. Defendant stated:

"Your Honor, in response to the state's accusation that I have no remorse, they're dead wrong. I may not be like a normal individual when it comes to feelings, remorse and general stuff like that. I look at it this way, I'm sorry for what I did and I feel that I should be punished, but sitting around crying, walking around like a zombie is not going to bring them back. I would like to remember them the way they was, the good times, the bad times. That's all I have left. They might not have been the best parents in the world, but in some terms they were good parents. I can just say that I'm going to cherish all the good times and the bad times that we all shared together."

The court found that the evidence showed all of the murders were premeditated, and committed in a brutal and heinous manner without provocation; defendant's demeanor during his confession was the best evidence of defendant's lack of remorse regarding the murders; and that defendant had a considerable record of criminal activity and antisocial behavior.

In mitigation, the court gave consideration to defendant's drug use and the abuse suffered at the hands of his parents. The court gave the greatest consideration to the question of whether defendant suffered from an extreme mental and emotional disturbance. As to this factor, the court stated it found the testimony of the State's psychiatrist, Dr. Jeckel, to be the "closest to reality with respect to the Defendant's state of mind." The court found

that "whatever was happening in the Odle family, was not a license for the defendant to kill his family members." Further questioning whether defendant was operating under an extreme mental or emotional disturbance, the court stated, "Defendant may have been the victim of some emotional abuse on the part of his parents toward him, but what did his brothers and sisters [*sic*] do to him to justify what he did to them?" Finding there were no mitigating factors sufficient to preclude imposition of the death penalty, the court sentenced defendant to death.

Defendant first contends that he should have been given the opportunity for surrebuttal during closing arguments at the guilt phase of the trial. Defendant asserts that because he admitted that he committed the crimes, the only issue to be decided was the issue of his sanity at the time of the offenses. Illinois law requires that "defendant bear[] the burden of proving by a preponderance of evidence his insanity at the time of the offense." (Ill. Rev. Stat. 1985, ch. 38, par. 3—2(b).) According to defendant, the party bearing the burden of proof on an issue is entitled to an opening and closing argument. Defendant concludes that he was the party with the burden of proof and that he was therefore entitled to present a surrebuttal argument on the issue of insanity.

Contrary to defendant's contention, the issue of his guilt was not eliminated at trial because of his confession to the crimes. When the defense of insanity is presented during a trial, the Criminal Code specifically places on the State the burden of proving every element of the underlying offense beyond a reasonable doubt, and states that the jury may not consider the issue of defendant's sanity unless and until it first finds that the State has proven the defendant guilty of the offense beyond a reasonable doubt. Ill. Rev. Stat. 1985, ch. 38, par. 6—2(e).

Furthermore, Supreme Court Rule 233 provides that "[t]he parties shall proceed at all stages of the trial, including *** opening and closing statements ***, in the order in which they appear in the pleadings unless otherwise agreed by all parties or ordered by the court." (107 Ill. 2d R. 233.) Pursuant to Rule 233, the State had the right to proceed first during closing arguments unless otherwise agreed or ordered by the court. (*People v. Williams* (1983), 97 Ill. 2d 252, 302, *cert. denied* (1984), 466 U.S. 981, 80 L. Ed. 2d 836, 104 S. Ct. 2364.) The decision of whether to grant defendant a surrebuttal argument on the insanity issue was in the sound discretion of the trial court. (97 Ill. 2d at 302.) Defendant points to no error of law or actual prejudice resulting from the trial court's decision. We therefore hold that it was not an abuse of discretion to deny defendant's request for a surrebuttal argument. See *People v. Caballero* (1984), 102 Ill. 2d 23, 48 (surrebuttal can only be repetitious of what has already been stated), *cert. denied* (1984), 469 U.S. 963, 83 L. Ed. 2d 298, 105 S. Ct. 362.

Defendant next asserts that some of the prosecutor's statements denied him a fair trial. We need not address defendant's contention as to one of these alleged improper statements because the record reveals that defendant's objection to the prosecutor's remark was sustained and the court took proper steps to admonish the jury that the court would instruct them as to the law. (*People v. Del Vecchio* (1985), 105 Ill. 2d 414, 442-43, *cert. denied* (1985), 474 U.S. 883, 88 L. Ed. 2d 173, 106 S. Ct. 204.) As to the other allegedly improper statements, defendant failed to object to any of these statements at trial and failed to raise any of these issues in his post-trial motions, which contained a total of 140 allegations of error. Failure to object to an alleged error at trial and in a post-trial motion results in waiver of the issue through procedural default, and our review of

these issues is limited to plain errors or defects in substantial rights which deprive the accused of a substantial means of enjoying a fair and impartial trial or which occur in cases in which the evidence is closely balanced. (*People v. Gacho* (1988), 122 Ill. 2d 221, 239; *People v. Holman* (1984), 103 Ill. 2d 133, 181-82 (Ryan, C.J., concurring in part and dissenting in part).) We have carefully reviewed the record and find that as to these statements, no plain errors or defects in substantial rights occurred; therefore, we deem these issues waived through procedural default.

Defendant's next contention concerns the trial court's consideration of factors in mitigation at the sentencing hearing. Defendant asserts that the trial court's reference to a New York case defining the phrase "extreme mental and emotional disturbance" caused the court to adopt too restrictive a definition of this mitigating factor and denied him a fair sentencing hearing. Defendant also failed to object during sentencing and failed to raise the issue in his post-sentencing motions, which would ordinarily result in waiver of the issue through procedural default; however, we have previously held application of the waiver rule inappropriate where the trial court gives improper consideration to a statutory factor in aggravation at a sentencing hearing. (*People v. Saldivar* (1986), 113 Ill. 2d 256, 266.) By logical extension, it would also be inappropriate to apply the waiver rule where a trial court gives improper consideration to a statutory factor in mitigation. We therefore address defendant's contention but limit our review to plain errors or defects in substantial rights. *People v. Gacho* (1988), 122 Ill. 2d 221, 239; *People v. Holman* (1984), 103 Ill. 2d 133, 181-182 (Ryan, C.J., concurring in part and dissenting in part).

When announcing its decision regarding the imposition of the death penalty, the trial court stated that:

"With respect to whether or not the defendant was suffering from extreme mental or emotional disturbance, the court under Illinois law gives the provision of the law its plain ordinary, its common sense meaning. I believe that it's not defined any further in Illinois law that the court is aware[.]

[A]s to how other states define the same or similar provisions in their laws[,] People v. Shelton, 88 MISC [sic] 2d. 136, 385 N.Y.2d 708, 1976 provides a definition adopted then in New York. An extreme [mental] or emotional disturbance is the emotional state of an individual who (a) has no mental disease or defect that rises to the level of insanity and, (b) is exposed to an extremely unusual and overwhelming stress and, (c) has an extreme emotional reaction to it as a result of which there is a loss of self-control and reasons [sic] overborne by intense feelings such as passion, anger, stress, grief, excessive agitation or other similar emotions.

The court's not adopting [the] New York definition as the Illinois definition, but the New York definition at least provides some background for the court to use in trying to give the Illinois provision its plain and ordinary, its common sense meaning."

The record belies defendant's contention that the trial court adopted the New York test. The trial court did not apply the three-prong *Shelton* test to defendant's case; rather, the court simply referred to the definition once when rendering its decision, and then only to provide a background in which to give the Illinois statute its plain, ordinary, commonsense meaning. The record demonstrates that the court considered all of the evidence presented at trial concerning defendant's state of mind, and we find no error in the trial court's consideration of the mitigating factor of extreme mental or emotional disturbance.

Defendant next contends that the trial court's consideration of evidence and adjudications from juvenile court proceedings at the sentencing phase violated his rights

under the Juvenile Court Act. (See Ill. Rev. Stat. 1985, ch. 37, par. 702—10(1)(b).) Defendant admits in his reply brief that this argument was recently addressed and decided adversely to him in *People v. Orange* (1988), 121 Ill. 2d 364, 388.

Defendant next asserts that there were sufficient mitigating factors to preclude imposition of the death penalty. Defendant argues that the evidence demonstrates he was operating under an extreme mental and emotional disturbance. (Ill. Rev. Stat. 1985, ch. 38, par. 9—1(c)(2).) Defendant also cites to his young age, his background as an abused child, the testimony concerning his abuse of drugs and the evidence concerning his rehabilitative potential as mitigating factors. Defendant also contends that he has shown remorse for the murders.

When reviewing a sentence of death, this court will make a separate evaluation of the record but will not overturn a trial court's findings when amply supported by the evidence. (*People v. Brownell* (1980), 79 Ill. 2d 508, 539-40.) We agree with the trial court that there are no mitigating factors sufficient to preclude imposition of the death penalty.

While defendant contends that he was operating under an extreme mental or emotional disturbance, no expert rendered an opinion at trial or at the sentencing hearing as to whether defendant was acting under an extreme mental or emotional disturbance. In addition, the trial court may have concluded from the evidence that defendant planned the murders well before he was threatened with eviction from the family home. The evidence also shows that defendant made every effort to methodically conceal the crimes by cleaning and locking the family home after the murders. The evidence further shows that defendant was able to deal calmly with callers to the house and with his friends during and after the murders. He was able to explain his parents' absence

to friends and neighbors, and the presence of blood marks on his neck and arm and the cuts on his hands. Finally, he was able to calmly and rationally deny he committed the crimes to his girlfriend, once she learned he was implicated in the murders. The record demonstrates that the trial court carefully considered the evidence and found that any mental or emotional disturbance from which the defendant may have suffered was not sufficient to preclude imposition of the death penalty. We see no reason to disturb this finding. See *People v. Crews* (1988), 122 Ill. 2d 266, 283.

The evidence concerning defendant's drug use was, at best, conflicting. While some of defendant's friends and two experts testified defendant was a heavy marijuana and alcohol user, and experimented with such drugs as LSD, PCP and cocaine, other witnesses and the State's expert testified that defendant was only an occasional or "recreational" drug user, and that if he did abuse a drug it was most likely marijuana. Furthermore, there was no evidence, other than defendant's statement to Dr. Althoff, that he used drugs on the day of the murders. Indeed, the witnesses who saw and spoke with the defendant on the day of the murders all testified that defendant did not appear to be under the influence of drugs. *Cf. People v. Gleckler* (1980), 82 Ill. 2d 145 (sentence of death vacated where alcoholic defendant was likely intoxicated at the time the crimes were committed and did not act alone).

Defendant's argument that his history of child abuse and the threatened eviction from the family home motivated him to commit these crimes is totally inconsistent with his own actions in killing not only his mother and father—the persons who allegedly perpetrated this abuse—but his two brothers and his sister as well. In an attempt to harmonize the killing of his brothers and sister with the patently inconsistent motive of reacting to

the abuse he suffered at the hands of his parents, defendant initially claimed that he killed his siblings because there was no one left to take care of them. However, defendant suggested in his statement to the police that he killed his siblings to avoid detection, stating that his brothers and sister "would run and tell." Defendant has also attempted to explain the killing of his brothers and sister by stating that he wanted to spare them from the pain of their parents' death; however, defendant failed to spare his sister the horror of her mother's death when he showed her Mrs. Odle's body before murdering her in the same manner.

Defendant's prior record of criminal and antisocial behavior is also significant. Defendant's record included four counts of residential burglary, one count of attempted residential burglary and five counts of theft. There was also evidence that he had beaten his brother Sean, coerced his brothers into committing acts of theft, engaged in sexual intercourse with one sixth-grade girl when he was a sophomore in high school and may have coerced a 14-year-old girl to engage in intercourse.

Defendant contends that he has shown remorse for the murders. Remorse is, by definition, a subjective factor. The trial court in this case found that defendant's demeanor during his confession was the best evidence of his lack of remorse. We find nothing in the record to disturb this finding. Defendant also asserts that the fact that he was 18 years of age at the time the murders were committed is a mitigating factor; however, given the nature of the crime and the character of this defendant, we find no reason to overturn the trial court's finding that there are no mitigating factors sufficient to preclude imposition of the death penalty. *People v. Free* (1983), 94 Ill. 2d 378, 428-29.

We note parenthetically the Supreme Court's recent decision in *Maynard v. Cartwright* (1988), 486 U.S. 356,

100 L. Ed. 2d 372, 108 S. Ct. 1853, which was decided after this case was briefed and argued. We further note that the issue involved in *Maynard* has not been raised in this case.

The Supreme Court remanded the *Maynard* case for resentencing, holding that defendant's death sentence was based in part on a vague and overbroad statutory factor in aggravation; namely, that the murder defendant was convicted of committing was "especially heinous, atrocious, or cruel." (*Maynard*, 486 U.S. at 356, 100 L. Ed. 2d at 382, 108 S. Ct. at 1859.) Relying in part on section 9—1(b)(7) of the Criminal Code of 1961 (Ill. Rev. Stat. 1985, ch. 38, par. 9—1(b)(7)), the trial court in this case found defendant eligible for the death penalty because one of "the murdered individual[s] was under 12 years of age and the death resulted from exceptionally brutal or heinous behavior indicative of wanton cruelty." While the word "heinous" and the noun form of the word "cruel" are contained in section 9—1(b)(7) of the Illinois statute, we do not believe that the section as applied in this case suffers from the same constitutional infirmity as the statute in *Maynard*.

The Supreme Court began its analysis in *Maynard* by looking to its decision in *Furman v. Georgia* (1972), 408 U.S. 238, 33 L. Ed. 2d 346, 92 S. Ct. 2726. The Court stated that:

> "*Furman* held that Georgia's then-standardless capital punishment statute was being applied in an arbitrary and capricious manner; there was no principled means provided to distinguish those that received the penalty from those that did not. [Citations.] Since *Furman*, our cases have insisted that the channeling and limiting of the sentencer's discretion in imposing the death penalty is a fundamental constitutional requirement for sufficiently minimizing the risk of wholly arbitrary and capricious action." (*Maynard*, 486 U.S. at 362, 100 L. Ed. 2d at 380, 108 S. Ct. at 1858.)

The Court held that the Oklahoma statute, as applied to that defendant, was vague and overbroad in that the words "especially heinous, atrocious, or cruel" failed to sufficiently guide or limit the discretion of the sentencer. (*Maynard*, 486 U.S. at 364, 100 L. Ed. 2d at 382, 108 S. Ct. at 1859.) The Court rejected Oklahoma's assertion that the addition of the word "especially" was sufficiently limiting, stating that:

"[t]o say that something is 'especially heinous' merely suggests that the individual jurors should determine that the murder is more than just 'heinous,' whatever that means, and an ordinary person could honestly believe that every unjustified, intentional taking of human life is 'especially heinous.'" *Maynard*, 486 U.S. at 364, 100 L. Ed. 2d at 382, 108 S. Ct. at 1859.

Section 9—1(b)(7) of our Criminal Code states that a person convicted of murder may be eligible for the death penalty if:

"the murdered individual was under 12 years of age and the death resulted from exceptionally brutal or heinous behavior indicative of wanton cruelty."

We view our statute as being much more specific in describing the conduct which qualifies an accused for the death penalty than the Oklahoma statute which was considered in *Maynard*, and not susceptible to arbitrary application when the requirements of the statute are strictly followed.

Just as the Supreme Court in *Gregg v. Georgia* (1976), 428 U.S. 153, 49 L. Ed. 2d 859, 96 S. Ct. 2909, found a similar provision of the Georgia code not to be unconstitutional on its face, we consider section 9—1(b)(7) of the Criminal Code not to be facially unconstitutional. We emphasize, however, as the Supreme Court held in *Godfrey v. Georgia* (1980), 446 U.S. 420, 64 L. Ed. 2d 398, 100 S. Ct. 1759, that although the statute may be constitutional on its face, it cannot be applied in

the manner that leads to arbitrary results. That is, certain qualifying requirements of the statute cannot be omitted so that its application is left unchanneled. Thus, the victim must be under the age of 12, and the conduct which brings about the victim's death must not only be exceptionally brutal or heinous, it must *also* be such that it is indicative of wanton cruelty.

As previously noted, section 9—1(b)(7) is not facially invalid. Moreover, there can be no doubt that the trial court in this case did not apply the section in an arbitrary or capricious manner. Defendant began to murder 11-year-old Scott Odle by strangling him with his hands. Realizing that his hands were tiring, defendant chose to finish murdering Scott by tying a pajama bottom around Scott's neck until he had succeeded in compressing Scott's neck to the size of an adult man's wrist. Certainly, defendant's decision to murder Scott in a manner expert testimony characterized as agonizing, and the determined manner in which he carried out this inexplicable crime, can only be described as exceptionally brutal or heinous behavior, indicative of wanton cruelty.

Defendant's final arguments relate to the constitutionality of the Illinois death penalty statute. Defendant does not raise any new challenges to the constitutionality of the statute; rather, he asks us to reconsider our prior cases upholding the statute's validity. We decline the invitation. The death penalty's sentencing scheme is not unconstitutional for the discretion it vests in the prosecutor in deciding to seek the death penalty. (*People v. Spreitzer* (1988), 123 Ill. 2d 1, 44-45; *People ex rel. Carey v. Cousins* (1979), 77 Ill. 2d 531, *cert. denied sub nom. Brown v. Illinois* (1980), 445 U.S. 953, 63 L. Ed. 2d 788, 100 S. Ct. 1603.) The State is not constitutionally required to bear a burden of persuasion at the second stage of the sentencing hearing. (*People v. Free* (1983), 94 Ill. 2d 378, *cert. denied* (1983), 464 U.S. 865,

78 L. Ed. 2d 175, 104 S. Ct. 200; see also *People v. Brownell* (1980), 79 Ill. 2d 508, 534, *pet. for cert. dismissed* (1980), 449 U.S. 811, 66 L. Ed. 2d 14, 101 S. Ct. 59.) The statute provides for adequate comparative review, and adequately narrows the group of persons eligible for death from others guilty of murder. *People v. Olinger* (1986), 112 Ill. 2d 324, 352, *cert. denied* (1987), 479 U.S. 1101, 94 L. Ed. 2d 180, 107 S. Ct. 1329; *People v. Brownell* (1980), 79 Ill. 2d 508, 541-44, *pet. for cert. dismissed* (1980), 449 U.S. 811, 66 L. Ed. 2d 14, 101 S. Ct. 59.

For the reasons set forth above, we affirm the defendant's murder convictions and his sentence of death. We hereby direct the clerk to enter an order fixing Wednesday, March 15, 1989, as the date on which the sentence of death entered by the circuit court of Jefferson County shall be carried out. The defendant shall be executed by lethal injection in the manner provided by section 119—5 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1987, ch. 38, par. 119—5). A certified copy of this mandate shall be transmitted by the clerk of this court to the Director of Corrections, the warden of Stateville Correctional Center, and to the warden of the institution where the defendant is confined.

*Judgment affirmed.*

JUSTICE MILLER, specially concurring:

I concur in the court's decision affirming the defendant's convictions and sentence of death. I do not believe that it is necessary in this case, however, to consider the constitutionality of the aggravating circumstance provided by section 9—1(b)(7) of the Criminal Code of 1961 (Ill. Rev. Stat. 1985, ch. 38, par. 9—1(b)(7)), and therefore I do not join that part of the majority's opinion.

The sentencing hearing in this case was conducted by the trial judge alone, the defendant having waived his

right to a jury for that purpose. In the first stage of the proceeding, the trial judge found the existence of two statutory aggravating circumstances rendering the defendant eligible for the death penalty: that the defendant had been convicted of murdering two or more persons (Ill. Rev. Stat. 1985, ch. 38, par. 9—1(b)(3)), and that the defendant's strangulation murder of his 11-year-old brother Scott was exceptionally brutal or heinous behavior indicative of wanton cruelty (Ill. Rev. Stat. 1985, ch. 38, par. 9—1(b)(7)). The parties then proceeded to submit evidence in aggravation and mitigation. At the conclusion of the hearing, the trial judge found that there were no mitigating circumstances sufficient to preclude imposition of the death penalty and accordingly sentenced the defendant to death. Although the defendant raises a number of arguments against his death sentence, he has made no challenge, in either the circuit court or this court, to the trial judge's findings regarding the existence of the two statutory aggravating circumstances. Nonetheless, the majority considers on its own motion the constitutionality of section 9—1(b)(7), which provided the second statutory aggravating circumstance found by the trial judge in this case.

The majority states that its inquiry is prompted by the United States Supreme Court's recent decision in *Maynard v. Cartwright* (1988), 486 U.S. 356, 100 L. Ed. 2d 372, 108 S. Ct. 1853. In *Maynard* the Court considered a provision in Oklahoma's capital sentencing law permitting the imposition of the death penalty in cases in which the murder was "exceptionally heinous, atrocious, or cruel." (*Maynard,* 486 U.S. at 364, 100 L. Ed. 2d at 378, 108 S. Ct. at 1856.) The Court noted, as a requirement of a constitutionally valid system of capital sentencing, that the sentencer's discretion be channeled and limited so that "the risk of wholly arbitrary and capricious action" can be reduced. (*Maynard,* 486 U.S. at

362, 100 L. Ed. 2d at 380, 108 S. Ct. at 1858.) Relying on *Godfrey v. Georgia* (1980), 446 U.S. 420, 64 L. Ed. 2d 398, 100 S. Ct. 1759, which ruled that a similar statutory aggravating circumstance had been applied in an unconstitutional manner by a jury, the *Maynard* Court held that the language of the Oklahoma statute was vague and failed to provide sufficient guidance to the sentencing authority.

The aggravating circumstance at issue here permits the imposition of the death penalty if "the murdered individual was under 12 years of age and the death resulted from exceptionally brutal or heinous behavior indicative of wanton cruelty." (Ill. Rev. Stat. 1985, ch. 38, par. 9—1(b)(7).) The majority notes the similarity between the language used in section 9—1(b)(7) and the language used in the Oklahoma statute. The majority believes, however, that the Illinois provision is "much more specific in describing the conduct which qualifies an accused for the death penalty than the Oklahoma statute which was considered in *Maynard*, and not susceptible to arbitrary application when the requirements of the statute are strictly followed." (128 Ill. 2d at 140.) Relying on the autoptic evidence presented at trial, the majority concludes that the circuit judge did not act arbitrarily or capriciously in applying section 9—1(b)(7) to the defendant's murder of the 11-year-old victim.

Unlike the majority, I see no reason to determine in this appeal the appropriate construction to be given to the "exceptionally brutal or heinous" aggravating circumstance provided by section 9—1(b)(7). Even if we were to assume that the "exceptionally brutal or heinous" aggravating circumstance was applied unconstitutionally in this case—and I express no opinion on that question—the defendant would not be entitled to a new sentencing hearing. (See *Barclay v. Florida* (1983), 463 U.S. 939, 956-58, 77 L. Ed. 2d 1134, 1148-49, 103 S. Ct.

3418, 3428-29 (plurality opinion); *Zant v. Stephens* (1983), 462 U.S. 862, 880-90, 77 L. Ed. 2d 235, 252-58, 103 S. Ct. 2733, 2744-50.) Here, the trial judge expressly found the existence of an additional statutory aggravating circumstance, the multiple-murder provision of section 9—1(b)(3) of the Criminal Code of 1961 (Ill. Rev. Stat. 1985, ch. 38, par. 9—1(b)(3)), which independently rendered the defendant eligible for the death penalty. Moreover, the trial judge's finding of the existence of the separate aggravating circumstance under section 9—1(b)(7) did not introduce any otherwise inadmissible evidence into the sentencing process. Having found in the first stage of the capital sentencing proceeding the existence of an independent and uncontested circumstance that rendered the defendant eligible for the death penalty, the trial judge was free to consider, at the second stage of the proceeding, the circumstances of the defendant's offenses. The Illinois death penalty statute does not accord any added significance to the existence of multiple statutory aggravating circumstances. Therefore, in light of the admissibility of the evidence on which the sentence was based, it cannot be said that the trial judge's finding of the existence of a second statutory aggravating circumstance, under section 9—1(b)(7), could have prejudiced the rights of the defendant.

*People v. Brownell* (1980), 79 Ill. 2d 508, is not to the contrary. The defendant in that case was convicted of murder, aggravated kidnapping, and rape. In a bench proceeding, the trial judge found the existence of two statutory aggravating circumstances rendering the defendant eligible for the death penalty: that the victim was killed in the course of the commission of a felony, and that the victim was an eyewitness against the defendant (see Ill. Rev. Stat. 1977, ch. 38, pars. 9—1(b)(6), (b)(7)). Following a consideration of the aggravating and mitigating evidence, the trial judge sentenced

the defendant to death for the murder conviction; sentences of imprisonment were imposed for the convictions for aggravated kidnapping and rape. On appeal, the *Brownell* court held that the first aggravating circumstance was applicable to the facts in that case but that the second circumstance was not. Referring to the trial judge's use of the "murdered eyewitness" aggravating circumstance, this court stated:

"The court appears to have made the finding that the victim was an eyewitness upon the evidence adduced at trial—that the victim, as the subject of the aggravated kidnapping and rape, could have later testified against the defendant. We do not think this particular factual situation was intended by the General Assembly to be included within this aggravating factor. Rather, we think the General Assembly intended to include situations where, during an investigation or prosecution of a separate offense which has previously taken place, a witness is killed in an attempt to stymie the investigation or prosecution." *Brownell*, 79 Ill. 2d at 525-26.

This court affirmed the defendant's convictions and sentences of imprisonment but vacated the defendant's death sentence and remanded the cause for a new capital sentencing hearing. The court explained:

"The partial resentencing hearing is essential because of the profound importance we attach to the trial court's role in weighing aggravating and mitigating factors. In this instance, the trial court weighed an aggravating factor which we have concluded figured erroneously in the court's sentencing decision. We have now removed that factor from the scale. Whether the scale will remain stable or will tip as a result of our conclusion is initially for the trial court to determine. For us either to affirm or reverse the trial court's sentence, without providing the trial court an opportunity to resentence in light of our conclusion of law, would usurp the trial court's function as the sentencing authority." *Brownell*, 79 Ill. 2d at 535-36.

In *Brownell* the sentencing judge construed the defendant's conduct as giving rise to an aggravating circumstance that was not actually warranted by the evidence. Thus, the trial judge's finding of the existence of the "murdered eyewitness" circumstance introduced into the case, and therefore into his sentencing determination, factual matters that should not have been considered. The present case is different, for even a declaration of the invalidity of the "exceptionally brutal or heinous" aggravating circumstance found in section 9—1(b)(7) of the Criminal Code would not preclude the sentencing judge from considering the evidence of the manner in which the defendant committed the murder of his 11-year-old brother.

JUSTICE STAMOS joins in this special concurrence.