Docket No. 79243–Agenda 25–May 1997.

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. LAWRENCE JACKSON, Appellant.

Opinion filed March 26, 1998.

JUSTICE McMORROW delivered the opinion of the court:

On June 23, 1988, defendant was convicted in the circuit court of Cook County of four counts of murder, one count of attempted murder, one count of aggravated battery of a child, five counts of home invasion, five counts of armed robbery, and one count of residential burglary. The State requested a death penalty hearing. The jury found defendant eligible for the death penalty on the basis of three statutory aggravating factors and, after considering aggravating and mitigating evidence, found that there were no mitigating factors sufficient to preclude imposition of the death sentence. The circuit court sentenced defendant to death on the murder conviction and ordered prison sentences for the nonmurder convictions. We affirmed defendant's conviction and death sentence on direct appeal. See 
People v. Jackson
, 145 Ill. 2d 43 (1991). Defendant petitioned the United States Supreme Court for a writ of 
certiorari
, which the Court granted. The Court then vacated our judgment and remanded the cause to this court for further consideration in light of 
Morgan v. Illinois
, 504 U.S. 719, 119 L. Ed. 2d 492, 112 S. Ct. 2222 (1992). See
 Jackson v. Illinois
, 506 U.S. 802, 121 L. Ed. 2d 5, 113 S. Ct. 32 (1992). On September 26, 1992, this court affirmed defendant's convictions and nondeath sentences, and vacated defendant's death sentence. We remanded the cause to the circuit court for a new sentencing hearing in accordance with 
Morgan
. On remand, the jury again found defendant eligible for the death penalty on the basis of three aggravating factors, and found no mitigating evidence sufficient to preclude imposition of the death penalty. The trial court entered a death sentence. That sentence is the basis of this appeal. We affirm.

BACKGROUND

The evidence presented at defendant's trial and first sentencing hearing is set forth fully in our opinion in defendant's direct appeal of his first death sentence. 
People v. Jackson
, 145 Ill. 2d 43 (1991). The eligibility phase of the second sentencing hearing began in September 1995. The first witness to testify was Urica Winder. She was 14 years old at the time of the second sentencing hearing. She testified that on September 24 and 25, 1986, she lived at 1850 West Washington Boulevard in Chicago with her mother (Vernita Winder), her two younger sisters (Dana, then four years old, and Shonita, or “Nicki,” then 18 months old), her mother's boyfriend (Mark “Tiny” Brown), and her mother's friend (Shirley Martin). Urica was six years old at the time the crimes were committed. The apartment they shared had two bedrooms, a living room, a kitchen, and a washroom.

Urica testified that on the evening of September 24, there was a knock on the front door of the apartment. When she asked who it was, she heard someone say “Bobby.” Upon opening the door, Urica saw two men: Bobby Driskel and defendant, both of whom Urica knew. They entered the apartment, and Urica went to bed in the children's bedroom. Shortly thereafter, her mother entered the children's bedroom and took Urica and Dana from that bedroom into her own. Shirley Martin was apparently also in the second bedroom.

Urica soon saw defendant and Driskel enter the second bedroom. Shirley was standing near defendant and said to him, “I love you. Don't kill me.” Defendant responded, “Well, I don't love you” and stabbed her in the chest. Driskel then approached Urica, holding a butcher knife in his right hand and a pen in his left hand. He told Urica, “I'm not going to mess with you.” He then started stabbing Urica in the stomach with the knife. Urica testified that Driskel eventually stopped stabbing her, and “dug [her] guts out with the pen.” When asked to elaborate, Urica said that “he took the pen and just started digging” in “the lower part of her stomach.” Driskel then left the bedroom.

Urica then saw only Shirley in the bedroom. In an attempt to flee, Urica ran out of the bedroom toward the front door and unlocked it. Before she could leave, she heard defendant call Driskel's name from the washroom, and Driskel grabbed Urica by the feet, dragged her back into her mother's bedroom, and started stabbing her again with the knife. Urica could not say how many times he stabbed her. While he was stabbing her for the second time, Urica “played dead,” by rolling her eyes up and stopping breathing. Driskel then stopped stabbing her. She testified that he then began searching the dressers and shelves, and said “Damn, ain't no money.” At some point Driskel and defendant left the apartment. Urica testified that she “played dead” until morning, when she got up off of her mother's bedroom floor and went to get a drink of water. She then saw Shirley's bloody body lying on the bedroom floor, and Tiny's bloody body on the couch. Tiny's foot was cut off. She saw Shonita lying on the couch. Dana's bloody body was on the floor near the kitchen, and her mother's bloody body was lying behind the kitchen table.

At this point, according to the testimony of Urica and Tamico Winder, Tamico called the victims' apartment. Tamico is Urica's cousin and lived in the same building as the victims. Urica answered the phone, and Tamico asked to speak to her mother. Urica said she could not wake her mother up. Tamico then went to the apartment, where she first saw Urica. Urica told her that “Tiny's cousin Bobby” did it. Tamico entered the apartment and saw Vernita, Dana, Tiny, and Shonita. All but Shonita were dead. Urica had blood all over her, and had something red coming out of her stomach near her navel. Tamico then went to get help. An ambulance came and took Urica to the hospital, where, she said, she stayed “for a long time.” The police visited her in the hospital and showed her some photographs. She identified photos of Driskel and defendant for the police.

The next testimony was presented via transcript from defendant's trial. The witness, Phillip Simms, testified that on September 25, 1986, Bobby Driskel, whom Simms knew, came to his apartment and offered to sell Simms a TV and a VCR. Simms said that he would need to see the TV and VCR. Driskel then went to a car parked in the alley, where Simms saw two other figures. Within five minutes, Driskel returned with a tall black male whom he identified as his uncle, O.C. Driskel was carrying the VCR and O.C. was carrying the TV. Simms agreed to pay $120 for both. Simms identified two exhibits as the TV and the VCR, as well as the remote control for the TV and a tape that had been inside the VCR.

Dennis Keane, a Chicago police department detective, testified that in the morning of September 25, 1986, he received an “assignment” of four dead persons at 1850 West Washington Boulevard and one additional victim on the way to Cook County Hospital. He and Detective Peterson went to the victims' apartment. There they found the dead bodies of Tiny, Dana, Vernita, and Shirley, as well as three bloody knives.

Later that day, Keane learned that Driskel, and then defendant, were in custody. Both Keane and Michael O'Donnell, then an assistant State's Attorney, testified that they met with defendant that evening. At that time, defendant had stains on his shorts and on his shirt which Keane believed were bloodstains. Defendant also had cuts on his hands and on his left forearm. Keane and O'Donnell asked defendant if he knew anything about the homicides at 1850 West Washington, and defendant said that he did not. When asked about the cuts on his hands, defendant said that he had been smoking cocaine the night before when the pipe exploded, cutting his hands. Later that evening, defendant made a second statement, in which he said that he and Driskel had been smoking cocaine at defendant's apartment the previous night, when they ran out of cocaine. They had no money, and attempted to borrow money from friends and family members. When that was unsuccessful, Driskel said that his friend Tiny had a TV, VCR, and some money, and so defendant and Driskel planned to go to Tiny's home. They arranged for O.C. Roland to drive them there. When they got to the victims' building, defendant and Driskel went upstairs to Tiny's second-floor apartment. Driskel knocked on the door, and a woman answered. Driskel asked for Tiny, but the woman said that Tiny was sleeping. Driskel then asked to use the bathroom, and both entered the apartment, with Driskel heading to the bathroom and defendant remaining by the door. When Driskel came out of the bathroom, defendant said to him, “What are you going to do?” At that point, Driskel took a knife and stabbed Tiny in the chest. When Tiny jumped up and started to resist, defendant assisted Driskel in stabbing Tiny. Meanwhile, everyone else in the apartment retreated to a back bedroom. They were trying to hold the door shut, but defendant forced it open. At this point, as O'Donnell paraphrased defendant's statement, “People started running out. [Defendant] grabbed the people, or they killed the people that were running out of the back bedroom of this apartment.” Defendant and Driskel took a TV and a VCR from the apartment, put them in Roland's trunk, and sold them. They used the proceeds to buy cocaine.

After defendant finished his statement, O'Donnell asked him to give a court-reported statement, and defendant agreed. A court reporter arrived at 11 p.m., and O'Donnell again asked defendant about the events of the previous evening. In the court-reported statement, which O'Donnell read to the jury, defendant said that Driskel is his brother-in-law, and that Roland is his uncle; that on September 24, Roland drove Driskel and defendant to 1850 West Washington, and that Driskel gave him directions; that they were planning “to kill Tiny,” Driskel's cousin, to get money, a VCR, and a TV; and that they had two knives. From there, the version of events is essentially the same as O'Donnell first described: they knocked on the door, a woman answered, Driskel used the washroom, defendant asked him what he was going to do, and they both killed Tiny. Defendant forced open the bedroom door and, he said, “[o]ne of them ran out, and one was still in there. That's the one I stabbed.” Defendant said that “the one [he] stabbed” was a “grown-up lady.” He also stated that he and Bobby both stabbed “Tiny's girlfriend.” When asked what happened to the children, defendant said “[o]ne of them ran out when I got through killing his [
sic
] mother. He [
sic
] said, `mama, mama.' That's when Disco [Driskel] grabbed it and put his hand over the kid's mouth. I turned around. When I turned back around, the kid was laying on the floor dead.” Defendant said that he and Driskel took a TV and VCR and put them in Roland's car; that he was bleeding because he accidentally stabbed himself; that they sold the goods to “some stud”; and that they went to the “cain spot.” The court reporter then transcribed his notes. Defendant read the statement, made a few corrections with a pen, and signed the statement. O'Donnell and Keane also signed it. O'Donnell testified that defendant did not appear to be under the influence of drugs or alcohol at the time. Keane showed defendant the TV and VCR recovered from Phillip Simms, and defendant identified them as the property that he and Driskel had taken from the victims' apartment. During the interview, Keane asked defendant if he was under the influence of drugs, and defendant said that he was not. Keane testified that there was nothing about defendant while he was at the police station that would have indicated that he was under the influence of drugs.

On cross-examination, Keane testified that he traveled to defendant's home on the afternoon of September 25, but did not find defendant there. Defendant went to the police station on his own. In one of defendant's statements (it is not clear which), he told Keane that he had ingested cocaine on the night of the incident. Neither Keane nor O'Donnell ever arranged to have urine or blood tests done to determine the amount of alcohol or drugs in defendant's body. Keane also asked defendant if the cuts on his hands and forearm were causing him pain, and defendant said they were not.

The next witness was Dr. Nancy Jones, an assistant medical examiner for Cook County. She testified regarding the report of Dr. Robert Stein, who had been chief medical examiner in September 1986, who performed the autopsies of Tiny, Vernita, Dana, and Shirley Martin, and who was since deceased. She identified the autopsy reports of each of the four murder victims. She testified that, according to these autopsy reports, Vernita Winder had received a total of 69 “sharp injuries” (or stab wounds); Dana Winder had received a total of 19 sharp injuries; Tiny had received a total of 29 sharp injuries; and Shirley Martin had received a total of 21 sharp injuries. Dr. Jones also testified that none of the injuries suffered by any of the four murder victims would have been sufficient to cause death immediately, because each victim died as a result of blood loss from multiple stab wounds. On cross-examination, Dr. Jones testified that she could not say who had been wielding the knife that killed each victim, and could not say for certain whether any wounds were suffered post-mortem.

Robert Pecha was the next witness for the State. He testified over defendant's objection that in June 1988, he served as the foreperson of the jury in defendant's murder trial. He identified the 17 verdict forms on which he and the other 11 jurors found defendant guilty of the 17 charges. These charges included four counts of murder. After Pecha's testimony was concluded, both the State and defendant rested, and made their closing arguments on the issue of eligibility. The jury then found defendant eligible for the death penalty on the basis of three aggravating factors: multiple murder; felony murder of Vernita Winder, Mark Brown, and Shirley Martin; and murder of a child, Dana Winder, under the age of 12 in an exceptionally brutal and heinous fashion.

The court then proceeded with the aggravation/mitigation stage of the sentencing hearing. The State presented several witnesses who testified regarding other crimes committed by defendant. These included a 1980 robbery in which defendant threatened to kill the arresting officer. Defendant was convicted of robbery and sentenced to three years in prison for this incident. A former assistant State's Attorney testified that in 1981, while serving that sentence at a halfway house, defendant signed out for a furlough and failed to return. Defendant was charged with “failure to return,” pled guilty, and was sentenced to two additional years. A police officer testified that he arrested defendant in 1980 for firing a shotgun in an alley. Finally, a Chicago police officer testified that in 1985, Vincent Rowe, defendant's cousin, told him that defendant had burglarized his apartment. Rowe said that Barbara Young, another resident of his building, had told him that she saw defendant carrying a television down the stairs. Rowe also said that he saw defendant leaving his building, and gave defendant's address to the officer. A group of officers then went to defendant's house and placed defendant under arrest. They found that he was carrying a kitchen knife. Barbara Young later identified defendant as the man she had seen carrying a television down the stairs. The officer testified that the State ultimately dismissed the charges against defendant for this incident. He explained that the dismissal was because Vincent Rowe declined to prosecute, and because Barbara Young was ill and unable to go to court.

Linda Hynek testified that she is a probation officer in Cook County. In 1987, she was asked to do a pretrial investigation on defendant. She interviewed defendant in October 1987. He told her that he did not finish high school, but received his GED while in prison. He said that he never used alcohol, and that he began using drugs at the age of nine. He said that he had smoked marijuana, smoked cocaine, smoked “happy sticks” (marijuana cigarettes laced with PCP), snorted heroin, and taken cough syrup laced with speed. He also said that since getting out of the penitentiary in 1983, he had used drugs “only occasionally.” He told her that he did not have a drug problem and had never sought treatment for drug addiction. He also told her that he had never worked, and that he supported himself by selling drugs. On cross-examination, Hynek testified that defendant told her that his father had left home when defendant was very young, and that he had been hit in the head with a baseball bat when he was 22. He never told her that anyone in his family was an alcoholic, and he never discussed whether he was beaten as a child or whether he ever saw his mother being beaten.

Because defendant's prison disciplinary record is of particular relevance to defendant's disparate sentence, we examine the evidence of his conduct while in prison in some detail. Kelly Byrne, a corrections officer at the Cook County jail, testified that in January 1986, she was working in an area of dormitories within the jail. She heard talking in the dorm and entered the room. She found defendant and several other inmates out of their beds, in violation of the rules. When she instructed defendant to go back to his bed, he climbed onto his bed and started to masturbate while looking at her. She filed a disciplinary report, charging him with intentional sexual misconduct. After that, he was sent to segregation for a few days. When he returned to Byrne's area, his behavior was very similar, and he exposed himself to her almost every night. She testified that she did not report those incidents because they were not very serious. Byrne also testified that, just before defendant's release from prison in June 1986, he approached her and said, “I will get you. I will find you and I will get you.” On another day shortly before defendant's release, he approached Byrne and asked her “how [her] little girl was doing.” Byrne explained that she had an 18-month-old daughter at the time, and that defendant's tone was “very threatening.” Byrne then found out defendant's release date and, after his release, began carrying a weapon when off-duty and taking different routes home from work. She also taught her baby-sitter how to use the weapon. Byrne did not file disciplinary reports of these two incidents. She never saw defendant outside of the jail.

Joseph Knowles, head of the inmate disciplinary hearing board at the Cook County jail and keeper of records for the Cook County department of corrections, testified that defendant was the subject of 10 disciplinary reports in the period from November 16, 1985, to April 29, 1986. These included several incidents of fighting, including one in which defendant threw a chair at another inmate; an assault on another inmate; and one incident of intentional indecent exposure (the same incident described by Byrne). In the period from November 5, 1986, to November 8, 1987, defendant was the subject of 10 additional disciplinary reports. These included two reports for fighting with other inmates; one for possession of a weapon, a “shank”; and one for assault on a corrections officer.

Knowles testified that on April 25, 1988, defendant was told by a corrections officer to turn around, so that the officer could search him. (It appears from the record that Knowles may have misstated this date, though defendant did not object.) Defendant refused and told the guard, as the report describes, “that he and his people *** will kick reporting officers ass and any other officers who came to Wing 2-J. At this time, [defendant] called to the other inmates to kick their ass. Reporting officer then called for several more officers, and after searching inmate Jackson, reporting officer found a sharpened metal object thought to be a weapon.” On the day of this incident, the superintendent of the prison wrote to Director Glotz to request that defendant be transferred to “increased maximum security.” He explained that defendant had been housed in segregation six times in the previous eight months, and had just “attempted to incite a riot among the Vice Lords on Wing 2-J.” Knowles testified that the Vice Lords are a Chicago street gang.

Knowles testified that defendant was the subject of 16 disciplinary reports between March 4, 1993, and September 12, 1994. In one incident, a female corrections officer twice ordered defendant to “lock up.” Both times he refused, and followed the second refusal by threatening the officer using extremely abusive language. He then approached the bars and reached through, attempting to grab the officer. In an August 1993 incident, at which Knowles was personally present, a riot broke out in a wing of the jail. Defendant armed himself with a three-foot-long steel rod. After authorities ordered the prisoners to cease rioting, and the prisoners refused, the officers stormed the wing. The prisoners, including defendant, fought the officers. Defendant fought until he was subdued by three or four officers and a dog.

On December 5, 1993, defendant was charged with arson for setting a fire in the jail. On December 6, 1993, defendant was charged with possession of five shanks. On August 15, 1994, an officer reported a disturbance from a number of cells. When he opened defendant's cell, defendant punched the officer. None of defendant's violations involved possession of drugs. Knowles testified that, in his 27 years as a corrections officer, he had come into contact with about one thousand prisoners, and that defendant would rank fourth in terms of dangerousness among that group of prisoners.

On cross-examination, Knowles testified that defendant had never been charged with murder, sexual assault, or stabbing a guard while in jail, and that the State had never charged him with a criminal offense for conduct while in jail. With regard to the December 1993 arson charge, Knowles testified that defendant was in a two-person cell at the time, and that the fire had been set outside of the cell. The disciplinary report did not indicate that anyone saw defendant set the fire, and defendant denied setting it. With regard to the August 1993 riot, Knowles admitted that the disciplinary report did not indicate that defendant was armed with a weapon. With regard to the superintendent's request of Director Glotz that defendant be moved because he had “attempted to incite a riot,” Knowles testified that no riot materialized, despite defendant's exhortations.

Jimmy Utley, the keeper of records for the Illinois Department of Corrections, testified about the disciplinary records contained in the Department of Corrections' master file on defendant. He testified that defendant was in the Illinois Department of Corrections twice. He was in Pontiac Correctional Center from January 18, 1982, to November 15, 1983, when he was paroled. During that first period of incarceration, defendant was found to have committed 58 violations of institutional rules. These included the 1981 failure to return; numerous incidents of insubordination toward corrections officers; possession of a shank in August 1982; and a February 1983 incident in which he threatened to kill a prison schoolteacher.

Defendant's second term in the Illinois Department of Corrections was from September 8, 1988, to January 5, 1993. In that period, defendant was found to have committed 38 violations of institutional rules. These included an October 1989 incident in which defendant refused to follow an officer's orders, and then threatened and assaulted him; another October 1989 incident in which corrections officers were removing another inmate from his cell, and defendant began pelting the officers with shoes, trash, and feces while using abusive language; a November 1989 incident in which defendant threw a meal tray at an officer and threatened him; a March 1990 incident in which defendant threatened and assaulted a guard; an April 1990 incident in which defendant threw a mirror and some boxes at an officer; an April 1991 incident in which defendant was found to possess a shank; another April 1991 incident in which defendant masturbated in the hatch of his cell while a female officer was present; yet another April 1991 incident in which he assaulted a corrections officer; a July 1991 incident in which defendant slammed a gate on an officer's arm; a November 1991 incident in which defendant masturbated out the hatch of his cell in the presence of a female officer; two January 1992 incidents in which defendant threw items at guards and then threatened them; a June 1992 incident in which two shanks were found in defendant's cell; a June 1992 incident in which defendant threatened to kill an officer while holding a metal stool; a July 1992 incident in which defendant assaulted an officer; an August 1992 incident in which defendant assaulted a guard; a September 1992 incident in which defendant threw a mirror at an officer, requiring the officer to get stitches; a November 1992 incident in which defendant threw hot liquid on another inmate, burning him; and numerous other incidents of insubordination. Utley also identified an April 29, 1991, memo from a Lieutenant Shettleworth to Louis Lowery in which Shettleworth explained defendant's recent conduct and the difficulty that corrections officers were having in moving him because he refused to comply with their orders and would drag them around while handcuffed. Defendant was “well over” three hundred pounds. Utley testified that none of the reports indicated that defendant was under the influence of drugs at the time, and that he was never reported for possession of narcotics.

On cross-examination, Utley testified that he had never met defendant. He also testified that a number of defendant's disciplinary reports were for putting up a curtain in his cell so that one could not see the toilet in defendant's cell. Other violations for which defendant was reported included taking extra portions of food, wearing shower shoes to the dining hall, and refusing to take off a homemade hat. Utley testified that, except for the failure to return, defendant was not charged criminally for any of his conduct while incarcerated. He admitted that on a December 1981 “supplemental program consideration report,” defendant is described as “not *** aggressive.” A March 1981 report found that defendant was “not viewed as aggressive and appears at this time [to be] cooperating with institutional personnel.” Utley admitted that numerous data summary reports (dated from September 1988 through 1992) each indicate that defendant denied having any gang affiliation when asked.

The State then recalled Joseph Knowles. He testified that in a December 1993 disciplinary report, defendant was charged with possession of a weapon and “gang activity.” Knowles then testified that, in his previous testimony, he had related the portion of the report which indicated that officers had uncovered a shank in a search of defendant's cell. However, he had not related the portion of the report which indicated that the search had also uncovered a letter with “gang literature.” The hearing board found defendant guilty of both possession of a weapon and gang activity. Knowles also testified that, in a July 1987 report, defendant was charged with fighting and gang activity. The latter charge was the result of a search of defendant's cell after the fight, in which officers found a copy of the “prayer” of the Conservative Vice Lords. That “prayer” was attached to defendant's file. He was found guilty of both fighting and gang activity. On cross-examination, Knowles admitted that the 1987 charge was in fact “gang items,” and that the gang literature from the 1993 incident was not preserved or made part of defendant's file, though it should have been. The “literature” from the 1993 charge was a letter. Knowles could not say whether it was a letter someone had sent defendant, though he admitted that if someone sent an inmate a letter relating to gangs, that inmate would be held responsible for the contents of the letter.

Dr. Demetra Soter was next to testify in aggravation. Dr. Soter is a member of the pediatric trauma unit at Cook County Hospital. She testified that, on the morning of September 25, 1986, she was paged and found Urica Winder in the trauma unit. She was conscious, though pale, with “open sucking chest wounds on both sides of her chest,” her lungs were visible, and her “belly laid open with part of her intestines hanging out.” She was in shock, with low blood pressure and high pulse. Though Urica seemed to be in pain, Dr. Soter testified that she could not be given any medicine to relieve the pain, because it would have further lowered her blood pressure. Urica was in the trauma unit for an hour, while doctors attempted to stabilize her for the operating room.

When Urica finally went into the operating room, the doctors found wounds to her heart, diaphragm, lungs, small intestine, liver, and aorta. Dr. Soter testified that the doctors performed an appendectomy on Urica, even though she did not have appendicitis. She explained that the scarring left by the stab wounds and surgery would be so severe that it would be impossible for anyone to cut her stomach open again. Thus, if she were ever to get appendicitis, it would have been impossible for anyone to operate on her, so the doctors removed her appendix. Urica was given a colostomy, and she had at least 18 tubes and drains inserted in her body. During the surgery, Urica's vital signs dropped five times, and she was given a great deal of blood. Her condition after surgery was critical, and Dr. Soter did not expect her to survive.

In the days after the surgery, doctors continued treating Urica heavily. She had to have the dressings on her bowels changed three times each day, and this was very painful for Urica. She had to continue changing these dressings for three months. She was in the hospital for a month. The doctors found 48 scars on Urica, but Dr. Soter estimated that Urica had been stabbed 42 times, and that six of the scars were “through and through” scars. Urica's permanent injuries include the external scarring; the internal scarring which would complicate any surgery she required; and a propensity for bowel obstructions. Dr. Soter asked Dr. Mary Fabri to provide therapy to Urica.

On cross-examination, Dr. Soter testified that Urica was referred to a psychologist (Dr. Fabri) because Urica would need a support system to explain what had happened. Dr. Soter explained that “it is important for victims of violence, abuse, to have a support system.” On redirect examination, Dr. Soter testified that, when she asked Urica who stabbed her, she replied “Tiny's cousin,” and later told her that “Pumpkin” was with him. She also corrected her previous testimony, saying that there were 46 scars that were the result of stabbing, so Urica was stabbed 40 times.

After a recess, Joseph Bennett, a deputy Cook County sheriff who was working as a courtroom security officer at the time of defendant’s sentencing hearing, was called to testify about events that occurred during the recess. He testified that just before the recess, he noticed that defendant had a paperclip in his hand. While Bennett was escorting defendant out of the courtroom, he saw defendant place the paperclip in his pocket. Bennett’s partner asked defendant to stand against the wall and defendant refused, and then pushed Bennett against the wall. At that point, Bennett and his partner attempted to restrain defendant, and the three men were involved in a scuffle that lasted for about 15 minutes. Bennett suffered lacerations on his cheek and mouth. It eventually took more than 10 deputy sheriffs to restrain defendant. When defendant was finally handcuffed, he threatened the officers. After this testimony, the State rested.

Dr. James O'Donnell, an expert in the fields of pharmacology and pharmacy, testified that he had been retained to examine defendant and render findings in his fields of expertise. He testified that his research of defendant's case included: a 1988 interview with defendant; a review of police reports; a review of transcripts of his earlier testimony (apparently from defendant's first sentencing hearing); a review of transcripts of Roland's testimony and statement to police; an interview with Mr. and Mrs. George Rowe; and a review of some educational materials on the effect of drugs on the brain. Dr. O'Donnell testified about the effects of heroin, cocaine, PCP, and alcohol. Of particular relevance was his testimony that, with chronic use, cocaine can cause paranoic reactions, fear, increased tendency towards violence, increased impulsivity, and rage reactions, and, in severe cases, can cause psychiatric reactions. A cocaine high also leads to strong cravings for more cocaine. Dr. O'Donnell also testified that PCP can create horrible hallucinations in users, and that alcohol releases inhibitions. The effects of alcohol add to the effects of any other drugs in a person's system.

With regard to defendant's condition on the night of the murders, Dr. O'Donnell testified that defendant told him that he had used cocaine and heroin over a period of several hours, and that Roland told him that he and defendant had also used PCP, alcohol, and perhaps marijuana that night. He said that the Rowes told him that defendant was giddy and visibly high. Defendant reported to him that, while he was growing up, he had used cough syrup laced with sleeping pills, cocaine, heroin, and PCP. Defendant's drug usage started when he was 10, and he claimed to have been using cocaine, heroin, and PCP on an “almost daily” basis as a “young adult.” Defendant also told O'Donnell that he was able to obtain cocaine, heroin, PCP, marijuana, and “speed” while incarcerated. On the basis of these facts, Dr. O'Donnell opined that defendant was “intoxicated and impaired by PCP, cocaine, and heroin” at the time of the murders. By “impaired,” Dr. O'Donnell explained that he meant that the brain's ability for thinking, mood, judgment, behavior, and perception would have been diminished; that there would have been a loss of control; and that tendencies toward impulsive and violent behavior would have been enhanced.

On cross-examination, Dr. O'Donnell testified that, during their interview, defendant told him that he was “always stealing things” to buy drugs; that he made a living selling heroin and cocaine, and had started at age 15; and that “if he had no money, [he would] stick somebody up.” When Dr. O'Donnell asked defendant what happened the night of the murders, defendant said that his memory was fuzzy and that he could not really remember. Dr. O'Donnell stated that his opinion was based largely on defendant's own statement that he was high. He also admitted that, based on statements by Roland and Driskel, defendant might not have ingested either alcohol or PCP before the murders. Dr. O'Donnell admitted that, while defendant told him that he considered himself a drug addict, O'Donnell did not know that defendant had told a probation officer that he did not have a real problem with drugs. Moreover, he conceded that this last statement by defendant did not comport with defendant's statements to him.

Dr. Michael Gelbort, an expert in the fields of psychology and neuropsychology, testified in mitigation that he had been retained to evaluate defendant. To this end, he interviewed defendant, examined him, and looked at the results of a number of tests. On the basis of this data, Dr. Gelbort concluded that defendant's brain functions are “abnormal.” Defendant shows “a general diffuse pattern of cognitive deficits” in “a number of different areas having to do with learning, memory, judgment, [and] intellect.” They include a “fairly significant learning disability.” Dr. Gelbort identified the source of this problem as a head injury while young, a difficult pregnancy, or a congenital problem. He said that defendant told him of two or three fairly significant head injuries. Defendant told him that he used alcohol, though not heavily, and that he used cocaine, marijuana, and PCP. Defendant's school records contained mostly failing grades.

Dr. Gelbort relied on a number of tests which were performed on defendant. The intelligence test showed that he has a verbal IQ of 80, a performance IQ of 80, and a full scale IQ of 78. Dr. Gelbort explained that the range of 80 to 89 is “low average,” while the range of 70 to 79 is “borderline mentally deficient.” He also found that defendant’s powers of attention and concentration, while not completely impaired, were less than normal. Defendant also seemed to have an “abnormal function level” of memory. Generally, Dr. Gelbort identified defendant’s problems as lying in the frontal lobes of his brain. In sum, he opined that defendant suffers from abnormalities in “the frontal lobe function” and “a high diffuse brain kind of problem.” He explained that these problems would probably lead to impaired reasoning and problem-solving, and reduced ability to control inappropriate behavior.

On cross-examination, Dr. Gelbort testified that he personally had spent about one hour with defendant. He stated that his opinion was based on the interview, the testing of defendant, and certain of defendant’s records. He admitted that defendant had not been completely truthful with him, that he could not be sure that defendant was honest in answering questions that were part of the testing, and that defendant would have a motive to be less than truthful so that he would appear less blameworthy. Finally, Dr. Gelbort stated that he had not concluded that defendant did not know the difference between right and wrong. On redirect examination, Dr. Gelbort noted that defendant has a GED.

Defendant also presented the testimony of several family members. His former sister-in-law testified that defendant feels remorse for the killings. George Rowe, Jr. (defendant's cousin), Alicia Jackson (defendant's sister), and Donald Jackson (defendant's brother) testified about defendant's family life as a child. Each testified that the family lived in a series of dilapidated homes which often were unheated and garbage-strewn, and that defendant's mother (Irene Jackson) had several boyfriends and a brother who would beat defendant. These included one boyfriend named Melvin who would tie defendant to a chair and whip him with an extension cord which had been placed in boiling water. They also testified that defendant's mother was an alcoholic. George and Alicia admitted having testified at defendant's first sentencing hearing in 1988, and not mentioning the abuse suffered by defendant in that testimony. Rowe testified that he was never asked in 1988 whether defendant had been abused. Alicia explained that, at defendant's first sentencing hearing in 1988, she testified only about defendant's personality, and did not mention the abuse he suffered. When defense counsel for the second sentencing hearing contacted her, counsel asked her whether the reports that defendant had been abused were true. Alicia initially disagreed. On cross-examination, Alicia admitted that her 1988 testimony did not include mention of Melvin's beating her mother or defendant. She explained that she had testified that her childhood was “okay” and “normal,” but had done so only because that was what she “wanted to believe.”

Irene Jackson, defendant's mother, testified that she and defendant's father separated in 1970, when defendant was seven years old. After they separated, neither Irene nor defendant had any contact with defendant's father. Defendant would occasionally ask about his father, and wondered why he never came to see him. She testified that defendant never graduated from elementary school. On cross-examination, she testified that Melvin lived with the family for only a short time and never disciplined defendant, and that defendant had never had a job.

On rebuttal, the State introduced a stipulation that, if called to testify, John Atiles, a Chicago police officer, would testify that on October 22, 1985, he responded to a call that George Rowe and Vincent Rowe had committed battery on defendant, and that both George and Vincent were arrested for battery. The State then rested. After closing arguments, the jury returned a verdict finding no mitigating factors sufficient to preclude the imposition of the death penalty. Defendant subsequently filed a motion for a new sentencing hearing, which the trial court denied.

ANALYSIS

Defendant raises 14 issues on appeal. We consider each issue separately.

I. Reverse-
Witherspoon

Defendant argues that he should have been allowed to 
voir dire
 the potential jurors on whether they would always vote for the death penalty if certain statutory aggravating factors were present. The State argues that, under our prior decisions, the trial court's 
voir dire
 questioning adequately protected defendant's constitutional right to “life-qualify” potential jurors.

A defendant has the right to “life qualify” the jury by having potential jurors asked if they would automatically vote for the death penalty in any case in which the defendant was found guilty of murder. In 
Morgan v. Illinois
, the United States Supreme Court noted its prior holdings that the sixth and fourteenth amendments require an impartial jury, that jurors who would not vote for the death penalty in any case are not impartial jurors, and that the State may challenge such jurors for cause. See 
Morgan v. Illinois
, 504 U.S. 719, 726-34, 119 L. Ed. 2d 492, 500-06, 112 S. Ct. 2222, 2228-32 (1992), citing, 
inter alia
, 
Witherspoon v. Illinois
, 391 U.S. 510, 20 L. Ed. 2d 776, 88 S. Ct. 1770 (1968). Following this reasoning, the Court held in 
Morgan 
that the converse is also true: that “[a] juror who will automatically vote for the death penalty in every case will fail in good faith to consider the evidence of aggravating and mitigating circumstances as the instructions require him to do.” 
Morgan
, 504 U.S. at 729, 119 L. Ed. 2d at 502, 112 S. Ct. at 2229. The 
Morgan 
Court found that, because such a juror has already formed an opinion on the merits of the case, he would not listen to the aggravating and mitigating factors in making a decision, and that juror cannot satisfy “the requirement of impartiality embodied in the Due Process Clause of the Fourteenth Amendment.” 
Morgan
, 504 U.S. at 729, 119 L. Ed. 2d at 502-03, 112 S. Ct. at 2229-30. For this reason, a defendant may challenge for cause any juror who would automatically impose the death penalty upon conviction. 
Morgan
, 504 U.S. at 729, 119 L. Ed. 2d at 503, 112 S. Ct. at 2230.

This court has reviewed two cases in which the scope of the 
voir dire
 questions under 
Morgan 
was an issue. In 
People v. Hope
, 168 Ill. 2d 1 (1995), the defendant was convicted of murder for an accomplice's shooting of a McDonald's employee during an armed robbery. The defendant had shot and killed a police officer while fleeing the McDonald's, and was convicted of that murder in a separate proceeding. As a result of the prior conviction, and the fact that the defendant was over the age of 17 at the time of the offense, the jury in the McDonald's murder conviction found him eligible for the death penalty under the multiple-murder eligibility factor. See 720 ILCS 5/9–1(b)(3) (West 1994). The jury then sentenced the defendant to death. The defendant challenged his conviction and sentence on a number of grounds, including the scope of the judge's 
voir dire
 questions. The judge had asked all potential jurors “whether they would automatically vote to impose death if they should convict the defendant of murder.” 
Hope
, 168 Ill. 2d at 29. The trial court refused the defendant's request to ask 10 other reverse-
Witherspoon
 questions. The defendant challenged the court's denial with respect to all 10, though he focused on the last two. The two key questions both asked “whether the potential juror would automatically vote to impose the death penalty if the jury should convict the defendant of murder and if they should be told that he was eligible for death because he had been convicted of another murder.” 
Hope
, 168 Ill. 2d at 28. This court upheld the trial court's refusal to ask these additional questions. It interpreted 
Morgan 
as holding “only that the defendant is entitled to have potential jurors questioned as to whether they would 
automatically 
vote to impose the death penalty upon a finding of guilt, 
without regard
 to the aggravating or mitigating circumstances present in the case.” (Emphasis in original.) 
Hope
, 168 Ill. 2d at 29. The court noted that the trial court complied with this mandate. “The further questioning desired by the defendant, inquiring into how the venire members would act given a particular aggravating factor, 
i.e.
, the [other] murder conviction, is clearly not required by 
Morgan
. To the contrary, 
Morgan 
specifically directed its holding toward the end of discovering jurors for whom `the presence or absence of either aggravating or mitigating circumstances is entirely irrelevant.' [Citation.] Conducting inquiry into whether a potential juror would vote to impose the death penalty, 
given a particular set of circumstances
, is thus not required by 
Morgan
.” (Emphasis in original.) 
Hope
, 168 Ill. 2d at 29-30, quoting 
Morgan
, 504 U.S. at 729, 119 L. Ed. 2d at 502-03, 112 S. Ct. at 2229.

In 
People v. Brown
, 172 Ill. 2d 1 (1996), the defendant was convicted of three counts of murder. The victims were a mother and her two children, ages two and three. The defendant was found eligible for the death sentence because he had been found guilty of murder of a victim under 12 years of age and “the death resulted from exceptionally brutal or heinous behavior indicative of wanton cruelty.” 720 ILCS 5/9–1(b)(7) (West 1994). The jury sentenced him to death. He challenged his conviction and sentence on a number of grounds, including the judge's 
voir dire
 questions. The trial court had refused a question submitted by the defendant: “If you sign a guilty verdict convicting Anton Brown of first degree murder of a two-year-old child, a three-year-old child and their mother, would you be able to consider reasons not to impose the death penalty, or would you automatically impose the death penalty?” Instead, the judge merely asked whether any of the jurors “ `would automatically impose the death penalty,' ” and, later, whether any of the jurors “ `would always vote for the death penalty.' ” 
Brown
, 172 Ill. 2d at 30. This court upheld the trial court's refusal to ask the question proffered by the defendant. Citing the decision in 
Hope
, the court found that 
Morgan 
entitles a defendant only to have prospective jurors “questioned as to whether they would automatically vote to impose the death penalty upon a finding of guilt, without regard to the aggravating or mitigating circumstances present in the case.” 
Brown
, 172 Ill. 2d at 30. The court held that the question submitted by the defendant, which asked whether a juror would automatically impose the death penalty given the aggravating circumstances present in the case, was clearly not required by 
Morgan
. 
Brown
, 172 Ill. 2d at 31. Rather, it held, 
Morgan 
requires that courts attempt to expose jurors who will vote to impose the death penalty without regard to the aggravating or mitigating circumstances of an individual case. 
Brown
, 172 Ill. 2d at 31.

In the present case, the trial court asked all of the prospective jurors: “Is there any one of you among the jurors who would return a verdict directing the court to impose the death penalty in every case where there is a finding of guilty of the offense of murder regardless of what the facts were that you heard?” The court refused to ask two questions requested by defendant. These questions, both relating to the statutory factors on the basis of which defendant was found eligible, were: “Would you impose the death penalty in all murder cases where more than one person was killed?” and “Would you impose the death penalty in all murder cases where a child is killed?” It is the decision of the trial court to refuse those questions that gives rise to the defendant's first argument.

Under this court's decisions in 
Brown 
and 
Hope
, the trial court's questions were sufficient to vindicate defendant's right under 
Morgan 
to “life qualify” the jury. In each of those two cases, we held that the defendant is entitled only to have the prospective jurors questioned as to whether they would automatically vote to impose the death penalty for a defendant convicted of murder. In 
Brown
, the court held that the defendant does not have a right to have the jurors questioned with respect to whether they would automatically vote for the death penalty in a case which included certain specific aggravating factors. Rather, it held that the jurors need only be asked whether they would automatically vote for the death penalty “upon a finding of guilt.” 
Brown
, 172 Ill. 2d at 30. The trial court in the case at bar did ask each of the potential jurors this question. Therefore, under our prior holdings, the court's 
voir dire
 questions did not violate the defendant's rights under 
Morgan
.

II. Vagueness of One of the Statutory Aggravating Factors

Defendant's next argument is that one of the statutory aggravating factors by which defendant was found eligible for the death penalty is “unconstitutionally vague.” The aggravating factors of which defendant was found guilty include section 9–1(b)(7), which provides for death sentence eligibility where the defendant was 18 years or older at the time of the offense and “the murdered individual was under 12 years of age and the death resulted from exceptionally brutal or heinous behavior indicative of wanton cruelty.” 720 ILCS 5/9–1(b)(7) (West 1994). Defendant argues that the language of section 9–1(b)(7) violates the eighth and fourteenth amendments of the United States Constitution because of its vagueness.

The United States Supreme Court has held that a state which authorizes capital punishment must “tailor and apply its law in a manner that avoids the arbitrary and capricious infliction of the death penalty.” 
Godfrey v. Georgia
, 446 U.S. 420, 428, 64 L. Ed. 2d 398, 406, 100 S. Ct. 1759, 1764 (1980). This duty includes “defin[ing] the crimes for which death may be the sentence in a way that obviates `standardless [sentencing] decisions.' ” 
Godfrey
, 446 U.S. at 428, 64 L. Ed. 2d at 406, 100 S. Ct. at 1764, quoting 
Gregg v. Georgia
, 428 U.S. 153, 195 n.47, 49 L. Ed. 2d 859, 887 n.47, 96 S. Ct. 2909, 2936 n.47 (1976). The state “must channel the sentencer's discretion by `clear and objective standards' that provide `specific and detailed guidance,' and that `make rationally reviewable the process for imposing a sentence of death.' ” 
Godfrey
, 446 U.S. at 428, 64 L. Ed. 2d at 406, 100 S. Ct. at 1764-65
. 
“[A] death penalty `system could have standards so vague that they would fail adequately to channel the sentencing decision patterns of juries with the result that a pattern of arbitrary and capricious sentencing *** could occur.' ”
 Godfrey
, 446 U.S. at 428, 64 L. Ed. 2d at 406, 100 S. Ct. at 1765, quoting 
Gregg
, 428 U.S. at 195 n.46, 49 L. Ed. 2d at 887 n.46, 96 S. Ct. at 2935 n.46. This court has interpreted this mandate to mean that a statutory aggravating factor might be unconstitutionally vague in two ways: it may be unconstitutionally vague on its face; or, while constitutional on its face, it may be unconstitutional in its application, where that application is “unchanneled,” so that it leads to arbitrary results. 
People v. Odle
, 128 Ill. 2d 111, 140-41 (1988), citing 
Godfrey
, 446 U.S. 420, 64 L. Ed. 2d 398, 100 S. Ct. 1759.

This court dealt with both concerns in 
Odle
. First, it held that section 9–1(b)(7) is constitutional on its face. 
Odle
, 128 Ill. 2d at 140. Second, it held that section 9–1(b)(7) is constitutional in its application as long as none of the “qualifying requirements of the statute [are] omitted.” 
Odle
, 128 Ill. 2d at 141. That is, “the victim must be under the age of 12, and the conduct which brings about the victim's death must not only be exceptionally brutal and heinous, it must 
also 
be such that it is indicative of wanton cruelty.” (Emphasis in original.) 
Odle
, 128 Ill. 2d at 141. See also 
People v. Lucas
, 132 Ill. 2d 399, 444 (1989) (explaining 
Odle 
holding).

Defendant's challenge to section 9–1(b)(7) is limited to its facial constitutionality, and does not challenge its application to this defendant. (Defendant does challenge its application where the application is based on accountability. See part III 
infra
.) In 
Odle
, the court held that section 9–1(b)(7) is constitutional on its face. We will not reconsider that holding here. Moreover, because defendant does not challenge the application of section 9–1(b)(7) to this defendant, we need not consider whether the application of section 9–1(b)(7) in this case (aside from the accountability issue) was unconstitutional.

III. Death Penalty Eligibility Based on Accountability

Defendant next challenges the application of section 9–1(b)(7) where that application is based on the theory of accountability. He claims that such application violates the eighth amendment's guarantee of individualized death penalty sentencing. This argument is based on the fact that Driskel apparently killed the only murder victim under the age of 12, Dana Winders. Thus, defendant argues, Driskel's actions cannot form the basis for defendant's death penalty.

We reject defendant's contention. “[W]here a defendant is found eligible based upon two or more statutory aggravating factors, the fact that one of those factors may later be invalidated will not generally impair the eligibility finding as long as a separate, valid aggravating factor supported eligibility.” 
People v. Brown
, 169 Ill. 2d 132, 165 (1996) (citing 
People v. Page
, 156 Ill. 2d 258, 268 (1993), and 
Zant v. Stephens
, 462 U.S. 862, 880-90, 77 L. Ed. 2d 235, 252-58, 103 S. Ct. 2733, 2744-50 (1983)). Thus, even if we were to invalidate the verdict of eligibility based on the murder of a child under 12, defendant would still be eligible for the death penalty based on the multiple-murder factor, of which he was found guilty.

IV. Sufficiency of Proof of Multiple Murder Convictions

Defendant was found eligible for the death penalty on the multiple-murder aggravating factor, which applies where “the defendant has been convicted of murdering two or more individuals.” 720 ILCS 5/9–1(b)(3) (West 1994). In attempting to prove the existence of this aggravating factor at the second sentencing hearing, the State presented the testimony of Robert Pecha, the foreperson of the jury at defendant's trial and first sentencing hearing. Pecha identified, over defendant's objection, the 17 verdict forms that the trial jury returned, including verdicts of guilty on four counts of murder. Defendant now argues that the State did not prove beyond a reasonable doubt that defendant was convicted of more than one murder.

The relevant aggravating factor applies if the defendant “has been 
convicted
” of more than one murder. (Emphasis added.) 720 ILCS 5/9–1(b)(3) (West 1994). The Criminal Code of 1961 defines “conviction” as “a judgment of conviction or sentence entered upon a plea of guilty or upon a verdict or finding of guilty of an offense, rendered by a legally constituted jury or by a court of competent jurisdiction authorized to try the case without a jury.” 720 ILCS 5/2–5 (West 1994). The Unified Code of Corrections defines “judgment” as “an adjudication by the court that the defendant is guilty or not guilty, and if the adjudication is that the defendant is guilty, it includes the sentence pronounced by the court.” 730 ILCS 5/5–1–12 (West 1994). Defendant argues that the State did not submit any evidence that defendant was convicted of multiple murders. The statutory aggravating factor requires a conviction, which is defined as a judgment. Defendant claims, however, that the State's evidence showed only that a guilty verdict was returned, and not that a judgment of guilty was entered by the trial court.

Defendant is correct that the statute requires a conviction, and that a conviction is defined as a judgment entered by a court. He is also correct that a guilty verdict returned by a jury is not the equivalent of a judgment. This is because courts do not impose judgments of guilty in every case in which a guilty verdict is returned. For example, a court might grant a motion for a new trial after a guilty verdict. See 725 ILCS 5/116–1 (West 1994).

However, defendant's argument relates to the sufficiency of the evidence. He is asking us to overturn the sentencing jury's verdict on the issue of eligibility because, it is argued, the State did not satisfy its burden of proof, despite the jury's verdict finding defendant guilty. It is well established that a verdict will not be overturned on appeal if it is supported by the record as a whole. See, 
e.g
.,
 Bass v. Cincinnati Inc
., 281 Ill. App. 3d 1019, 1027 (1996); 
Friedland v. Allis Chalmers Co. of Canada
, 159 Ill. App. 3d 1, 9 (1987). Moreover, a court will take judicial notice of its own records. 
E.g.
, 
Fox v. Fox
, 9 Ill. 2d 509, 518 (1956). The record in this case reveals that the trial court entered a judgment of guilty on four counts of murder on June 23, 1988. In our opinion in defendant's first appeal, we noted both the guilty verdicts returned by the jury, and the fact that the court entered judgment on those verdicts. 
Jackson
, 145 Ill. 2d at 77. Therefore, the record is clear that, in fact, a judgment of guilty was entered on four counts of murder. The jury concluded that defendant had been convicted of more than one murder. The record as a whole clearly supports that conclusion. Therefore, we will not disturb the jury's verdict on this point.

V. Sufficiency of the Felony Murder Verdicts

Defendant next argues that the jury's verdicts on eligibility based on felony murder were legally insufficient because they omitted the required mental state for eligibility and failed to specify what other felony had been committed. The factors by which defendant was found eligible for the death penalty included section 9–1(b)(6) of the Criminal Code. This section provides for eligibility in murder cases where the defendant was 18 years or older at the time of the offense (720 ILCS 5/9–1(b) (West 1994)), and where the victim was killed in the course of another felony (720 ILCS 5/9–1(b)(6) (West 1994)); was killed by the defendant or was physically injured by the defendant substantially contemporaneously with the injuries that caused death (720 ILCS 5/9–1(b)(6)(a) (West 1994)); the defendant acted with intent to kill or the knowledge that his acts created a strong probability of death or great bodily harm (720 ILCS 5/9–1(b)(6)(b) (West 1994)); and the other felony was one of group listed in the statute (720 ILCS 5/9–1(b)(6)(c) (West 1994)).

The verdict forms from the eligibility phase included three felony murder verdict forms: for the felony murders of Mark Brown, Vernita Winders, and Shirley Martin. These forms read:

“We, the jury, unanimously find beyond a reasonable doubt that the defendant, Lawrence Jackson, is eligible for a death sentence under the law. We unanimously find beyond a reasonable doubt that:

the defendant was 18 years old or older at the time of the murders for which he was convicted in this case; and

the following statutory aggravating factor exists:

Mark Brown was killed in the course of another felony.”

The jury received identical verdict forms for the felony murders of Vernita Winder and Shirley Martin. Defendant now argues that these verdict forms were insufficient because they did not include mention of defendant's state of mind, or specify the underlying felony, both of which are elements of this statutory aggravating factor.

The verdict forms in this case were clearly insufficient in that they did not explain all of the required elements of the statutory aggravating factor. The rule in these situations was explained in our opinion in 
People v. Mack
, 167 Ill. 2d 525 (1995):

“It is well established that a general verdict of `guilty in manner and form as charged in the indictment' or simply `guilty' is sufficient to sustain a conviction [citation], as is a verdict identifying the offense by name [citation]. However, where the verdict purports to set out the elements of the offense as specific findings, it must do so completely or be held insufficient.” 
Mack
, 167 Ill. 2d at 538.

In 
Mack
, the defendant had been convicted of armed robbery and was found eligible for the death penalty under the felony murder aggravating factor. However, the felony murder eligibility verdict form set forth the elements of felony murder but did not include mention of the defendant's state of mind. Applying the above rule to the facts of that case, we concluded:

“We note, as does defendant, that the form of verdict presently in use for cases where only one statutory aggravating factor is at issue is in the nature of a general verdict; it simply pronounces the defendant `eligible' for the death penalty and finds that `the statutory aggravating factor' exists. [Citation.] In contrast, however, the jury here did not return a general verdict. Its verdict does not state that defendant was found eligible for the death penalty, nor does it simply state that a statutory aggravating factor was found to exist. Rather the verdict attempted to set forth a statutory aggravating factor, but failed to do so completely and omitted an essential element. The verdict cannot withstand scrutiny under the principles set forth above.” 
Mack
, 167 Ill. 2d at 538.

Like the verdict form in 
Mack
, the verdict forms on the felony murder eligibility factors in this case attempted to set forth the elements of the statutory aggravating factor. However, each form failed to do so completely with respect to two elements of the factor. Each failed to include the defendant's 
mens rea
, as well as the underlying felony. Thus, each of the three verdicts on felony murder eligibility was insufficient.

Nevertheless, the State argues that defendant waived this point by not raising this issue at the sentencing hearing or in his post-sentencing motion. As a general rule, the failure to object to an alleged error at sentencing and in a post-sentencing motion results in a waiver of that error on appeal. 
E.g.
, 
People v. Simms
, 143 Ill. 2d 154, 170 (1991). Defendant argues that this case falls within the plain error rule, which permits a reviewing court to take notice of errors which would otherwise be waived “where the evidence is closely balanced or where the nature of the error is such as to deprive the accused of his constitutional right to a fair sentencing hearing.” 
Simms
, 143 Ill. 2d at 170.

Thus, the question before us is whether the issue was waived, or whether the plain error rule operates to protect this issue from the principle of waiver. However, we need not decide this question, because we have determined that defendant was properly found eligible for the death penalty under the multiple-murder aggravating factor. Even if we were to invalidate a finding of eligibility based on one aggravating factor, defendant may still be eligible on the basis of a verdict on another aggravating factor. See, 
e.g.
, 
People v. Brown
, 169 Ill. 2d 132, 165 (1996) (citing 
People v. Page
, 156 Ill. 2d 258, 268 (1993), and 
Zant v. Stephens
, 462 U.S. 862, 880-90, 77 L. Ed. 2d 235, 252-58, 103 S. Ct. 2733, 2744-50 (1983)). Therefore, even if we were to invalidate the verdicts of eligibility based on felony murder, defendant would still be eligible for the death penalty based on the jury's verdict on the multiple-murder aggravating factor and our affirmance of that verdict.

VI. Evidence of Defendant's Gang Activity

Defendant next argues that the evidence submitted by the State which showed that he is a gang member, possessed gang literature, and violated prison rules by engaging in unspecified gang activity was unreliable and violated his first amendment rights of freedom of speech, religion, and association.

At the beginning of the aggravation stage of the sentencing hearing, defendant made a motion 
in limine
 to bar the State from introducing evidence that defendant was a gang member. The State argued that, under 
Dawson v. Delaware
, 503 U.S. 159, 117 L. Ed. 2d 309, 112 S. Ct. 1093 (1992), it had a right to introduce gang activity as long as that activity was associated with violence. The State also declared that there was one incident in which defendant's gang membership was associated with violence, and that it intended to introduce evidence of that incident. The State indicated that it would not introduce other evidence of gang association.

During the aggravation stage, the State initially introduced evidence of one incident of gang-related violence. Joseph Knowles, the keeper of records for the Cook County department of corrections, testified about the content of defendant's disciplinary records with that department. According to Knowles, one report stated that on April 25, 1988, defendant threatened an officer and attempted to incite a riot among the inmates in one wing of the prison. Knowles also introduced a request from the jail superintendent that defendant be moved to increased security because–in a reference to the same event–defendant had just “attempted to incite a riot among the Vice Lords on Wing 2-J.” Knowles testified that the Vice Lords are a Chicago street gang. The defense objected to this evidence, and at sidebar the prosecutor was asked if “this [is] the one reference [to gang activity] that the State is allowed.” The prosecutor said that it was. The trial court admitted the evidence.

Jimmy Utley, the keeper of records for the Illinois Department of Corrections, then testified about the content of defendant's disciplinary records at the state prison at Pontiac. On cross-examination by counsel for defendant, Utley testified that the records indicated that defendant was “unknown for gang affiliation,” and that defendant had denied having any gang affiliation. After this testimony, the State indicated that it intended to introduce certain evidence which indicated that defendant was a member of a gang. Defendant objected, but the trial court ruled that the defense had “opened the door” to the testimony of gang membership by offering evidence which tended to show that he was not a gang member. After this ruling, the parties stipulated to the jury that Linda Hynek, the probation officer who completed a pretrial investigation of defendant in October 1987, would testify if called that defendant told her that he was a member of the Vice Lords when she interviewed defendant in October 1987. The State then recalled Joseph Knowles. He testified that a December 1993 disciplinary report indicated that, during a “shakedown” of defendant's cell at the Cook County jail, prison officers found “gang literature.” He also testified that a July 1987 report indicated that gang literature–specifically, the prayer of the Vice Lords–was found in defendant's cell. The 1993 incident involved a letter which was not preserved. The prayer which was found in the 1987 incident had been preserved and was read to the jury. On cross-examination, Knowles testified that an inmate is held responsible for the contents of any letter which he receives. At the close of evidence, the trial court granted the State's motion to include the Vice Lords prayer in the evidence given to the jury. Thus, the State eventually presented evidence of four incidents which related to defendant's gang membership: defendant's April 1988 attempt to incite a riot (as documented by both a disciplinary report and a request from the prison superintendent), the stipulation that Linda Hynek would testify that defendant told her that he was a Vice Lord, the 1993 charge of possession of “gang literature,” and the 1987 charge relating to possession of a copy of the prayer of the Vice Lords.

In 
Dawson
, the United States Supreme Court held that the first and fourteenth amendments bar the admission of evidence of gang membership alone when it is irrelevant to any aggravating circumstance. 
Dawson v. Delaware
, 503 U.S. 159, 166-67, 117 L. Ed. 2d 309, 318, 112 S. Ct. 1093, 1098 (1992). In 
People v.
 
Brown
, 172 Ill. 2d 1 (1996),
 
we held that, under 
Dawson
, “evidence of gang affiliation is admissible during a capital sentencing hearing to show a defendant's behavior, violations, and discipline while in prison,” as well as “to rebut mitigating evidence offered by a defendant.” 
Brown
, 172 Ill. 2d at 47-48.

Under these holdings, the evidence of defendant's gang membership is relevant, and its admission is not precluded by 
Dawson
. The evidence that defendant attempted to incite a riot among the Vice Lords in a certain wing of the jail falls within the category of evidence which is submitted to show a defendant's “behavior, violations, and discipline while in prison.” 
Brown
, 172 Ill. 2d at 47. Even if one quarrels, as defendant does, with the description of the event as an attempt to incite a riot, there is no dispute that defendant threatened violence and called other inmates to violence. A call to violence which is made to fellow gang members rises well above evidence of mere “gang membership.” It clearly relates to defendant's violence and behavior while in prison. Thus the evidence relating to the 1988 incident is relevant.

Moreover, defendant's statement to Linda Hynek that he is a member of the Vice Lords, and the 1987 and 1993 incidents in which defendant possessed gang literature, are also relevant. The evidence that defendant identified himself as a gang member and had gang literature (in the form of a letter which apparently contained gang references and a copy of a gang prayer) lies within the rule that gang membership evidence may be admitted to rebut mitigating evidence offered by a defendant. 
Brown
, 172 Ill. 2d at 47-48. In an attempt to impeach the State's aggravating evidence that defendant attempted to incite a riot, defendant offered evidence which tended to show that he was not a gang member. In response, the State offered evidence which tended to show that defendant was a gang member. The trial court properly ruled that defendant had “opened the door” to the evidence of gang membership by introducing evidence tending to show that defendant was not a gang member, and the State had a right to rebut that evidence.

Defendant makes a second argument relating to the evidence of the 1988 incident in which defendant attempted to incite a riot. He argues that the written request by the superintendent of the Cook County jail that defendant be moved to “increased maximum security” after the incident was not reliable and, thus, should have been excluded. Knowles testified that, according to the description of the incident in the disciplinary report, defendant was told to turn around so a corrections officer could search him, and defendant “refused and said that he and his people would kick reporting officer's quote will kick reporting officers [
sic
] ass and any other officers [
sic
] who come to the Wing 2-J. At this time [defendant] called to the other inmates to kick their ass.” Knowles testified that, as a result of this incident, defendant was charged with “refusing an order by prison staff,” “threats by words,” and possession of a weapon. There was apparently no mention of the Vice Lords in the disciplinary report. Knowles testified that defendant was found guilty, and that, as a result of this incident, the superintendent had requested that defendant be transferred to increased maximum security because defendant had been placed in segregation six times in the last eight months and, in reference to the incident, had “attempted to incite a riot among the Vice Lords.”

Defendant claims that the evidence of the 1988 incident is unreliable because there are two descriptions of the same event which, it is argued, may or may not be accurate. The disciplinary report described the event as one in which defendant threatened to assault a guard and urged other inmates to also assault guards. The report from the prison superintendent states that defendant “attempted to incite a riot among the Vice Lords.” Defendant's argument, essentially, is that this latter statement is unreliable and prejudicial because there is no evidence in the earlier report which supports the notion that the defendant had called on Vice Lords to riot, or the implication that defendant is or was a Vice Lord himself.

“At a capital sentencing hearing, the rules of evidence are relaxed and evidence is admissible as long as it is both relevant and reliable. [Citations.] The evaluation of a testimony's relevance and reliability lies within the sound discretion of the trial judge. [Citation.] The fact that the evidence presented contains hearsay does not make it 
per se
 objectionable, nor does it deny defendant his right to confront witnesses. [Citation.]” 
Brown
, 172 Ill. 2d at 49. The evidence of defendant's attempted incitement of his fellow inmates is relevant, as we have held that evidence of a prisoner's conduct is admissible even where gang-related. The evidence that defendant called to other inmates is also reliable. The only question is whether the superintendent's request was not reliable, because it stated that defendant had “attempted to incite a riot” among the Vice Lords when the report on which it was apparently based did not mention the Vice Lords. We agree that there is some question as to that memorandum's reliability, because of the difference between it and the underlying report. Nevertheless, the admission of that report was at most harmless error. The report was admissible to show an attempted incitement to riot. Its only alleged flaw was that it implied that defendant was a gang member. Taken alone, this alleged flaw might have constituted prejudicial error. However, evidence that defendant was a Vice Lord was subsequently admitted when defendant opened the door to evidence of gang membership, and we have found that admission to have been proper. Therefore, the mention of that fact in the superintendent's memorandum was merely cumulative, and did not work to defendant's prejudice.

VII. Reliability of Evidence of Defendant's Burglary of

Vincent Rowe's Home

Defendant next argues that evidence relating to defendant's alleged burglary of Vincent Rowe's home should not have been admitted. Defendant argues that the evidence of the burglary was unreliable because of Vincent Rowe's eventual refusal to prosecute the case. The same evidence was offered at defendant's first sentencing hearing, and defendant raised the same issue in his appeal of that first sentence. We held that hearsay evidence of crimes which did not result in prosecution or conviction is admissible at the aggravation/mitigation phase of a capital sentencing hearing if the evidence is relevant and reliable, and that this evaluation of relevance and reliability is left largely to the sentencing judge. 
Jackson
, 145 Ill. 2d at 115. Applying these principles, we found that the sentencing judge at the first sentencing hearing did not abuse his discretion in allowing that evidence. 
Jackson
, 145 Ill. 2d at 116. We now reach the same conclusion with regard to the sentencing judge's admission of the evidence at the second sentencing hearing. There was substantial evidence that defendant committed the burglary. The fact that the case was not prosecuted was admitted because it also is relevant. However, the mere fact that defendant's cousin refused to prosecute the case does not render all other evidence of his guilt unreliable. Therefore, we again find that the judge acted within his discretion in admitting the evidence.

VIII. Trial Court's Exclusion of Expert Testimony

Defendant next argues that the trial court incorrectly limited the defense's cross-examination of one of the State's expert witnesses. Dr. Soter testified for the State in the second stage of the sentencing hearing. The trial court found that Dr. Soter was an expert in the field of pediatric trauma. She testified that she was Urica Winder's treating physician from the time that she arrived at Cook County Hospital, and that she was still treating her at the time of the second sentencing hearing. She testified about Urica's condition when she first began treating her, and the treatments that Urica received. Dr. Soter also testified that on the day that Urica came to the hospital, Dr. Soter paged Dr. Mary Fabri. Dr. Fabri, a pediatric psychologist, provided therapy to Urica for seven years after the attack.

On cross-examination, Dr. Soter testified that she referred Urica to a psychologist so that Urica would have a “support system who would explain to her everything that had happened.” Over the State's objection, Dr. Soter testified that it is important for victims of violence or abuse to have a support system. She agreed with defendant's suggestions that “any child that goes through such a series of violence would need a support system”; that the support should almost immediately follow the abuse if it is discovered; that abuse leaves emotional scars; and that these scars can be suppressed. Defense counsel asked Dr. Soter over the State's objection whether “anger, as a side effect of trauma, [which] is not treated” will escalate. She stated that “[t]here are different stages that people will go through. It's just like the stages of death. First, there is denial, and then there is anger, and then, at the end, there is acceptance. So, the usual thing that happens is there is stages. If a child is taken out of the violent environment–and some people might get stuck in one stage–but usually it comes and goes. Eventually it gets dealt with and it passes just like the stages of death.” The cross-examination continued as follows:

“Q. And you have indicated that aggressive behavior and this anger is a side effect of this trauma; is that correct?

State: Objection.

Court: Sustained.

Q. What would happen if a child who is a victim of trauma of abuse [
sic
] is not removed from the violent environment?

State: Objection.

Court: Sustained.

Q. Is it safe to say that a child should be removed from that environment?

State: Objection.

Court: Sustained.”

Dr. Soter then testified that a child should be removed from a violent environment in order to save that child's life. The examination then continued:

“Q. And if not removed, that life could be seriously altered, if not lost; is that correct?

State: Objection.

Court: Sustained. Objection will be sustained. The Jury will disregard that question and answer.

Q. What would happen if a child is not removed from that violent environment?

State: Objection.

Court: Sustained.

Q. As an expert in child abuse, if a child is not removed from a violent environment, what could potentially be the result?

State: Objection, your Honor.

Court: Sustained.

Q. Doctor, in your experience as a child abuse expert, you have come across reports of abuse not dealt with in later life; is that correct?

State: Objection.

Court: Sustained.

Q. Doctor, have you ever come across reports involving trauma and abuse unattended to?

State: Objection.

Court: Sustained.

Defense Counsel: No further questions, Judge.”

On redirect examination, Dr. Soter testified that she referred Urica to Dr. Fabri because Dr. Soter is an expert in physical trauma to children, and not in the field of psychiatric treatment of children's trauma.

Defendant now argues that the sentencing judge erred in limiting the cross-examination of Dr. Soter regarding the effects of childhood abuse. Defendant's theory of mitigation was that he had been the victim of severe childhood abuse, and that his responsibility for his actions was diminished as a result of that abuse and his state of intoxication. In furtherance of this theory, defendant attempted to elicit general testimony from Dr. Soter that the effects of severe childhood trauma, if untreated by a psychologist, could include anger and aggressive behavior which were, at least to a point, beyond that person's control. Although Dr. Soter was testifying as an expert in Urica's medical condition and the prospects for her quality of life in the future, defendant was attempting to elicit testimony about traumatized children in general. He claims that the sentencing judge's rulings which prevented him from doing so constitute reversible error.

The principles governing the scope of cross-examination of an expert witness are well established. In short, while the trial court must grant a party wide latitude in cross-examining an expert (
e.g
., 
People v. Buggs
, 112 Ill. 2d 284, 290 (1986)), that cross-examination should generally be limited to matters raised in direct examination. See generally M. Graham, Cleary & Graham's Handbook of Illinois Evidence §705.2, at 621-26 (6th ed. 1994). Moreover, the trial court's judgments as to whether an area falls within the proper scope of cross-examination are not to be disturbed “unless there has been a clear abuse of discretion resulting in manifest prejudice to the defendant.” 
People v. Kitchen
, 159 Ill. 2d 1, 37 (1994).

In light of these principles, we determine that the trial court's decision regarding the scope of defendant's cross-examination of Dr. Soter did not constitute reversible error. The trial court limited defendant's cross-examination because he considered it to be beyond the scope of Dr. Soter's direct examination. Dr. Soter testified as an expert in the field of pediatric trauma. Her testimony on direct examination related to Urica's physical condition at the time she arrived at the hospital, and the medical care that she had received and would continue to receive for those physical injuries. The trial court found that defendant's questions about the psychological effects of abuse on a child were beyond the scope of her direct examination. We cannot say that the trial court's decision constituted “a clear abuse of discretion.”

IX. Prosecution Argument Regarding Truthfulness of Mitigation Evidence and Defense Counsel Conduct

Defendant next argues that the State made improper arguments to the jury in the closing argument during the second stage of defendant's sentencing hearing. Defendant's cousin George Rowe, brother Donald Jackson, and sister Alicia Jackson each testified that defendant had been severely beaten as a child by his mother's boyfriend. On cross-examination of each, the State brought out the fact that neither the cousin nor the brother had testified at defendant's first sentencing hearing in 1988, that the cousin had testified at Driskel's first sentencing hearing, and that both the cousin and brother were testifying for the first time that defendant had been abused. Defendant's sister admitted on cross-examination that she had testified at defendant's first sentencing hearing in 1988. She admitted that, in her previous testimony, she had not mentioned the fact that defendant had been abused as a child, and in fact had testified that her own childhood was “okay” and “normal.” In her testimony at the second sentencing hearing, she admitted having so testified, but explained that she had done so “because that's what [she] wanted to believe.” In the rebuttal portion of its closing argument in the second stage of defendant's second sentencing hearing, defendant claims that the State “attacked the credibility of these witnesses, [and] suggested to the jury that defense counsel was responsible for these witnesses' lying to the jury.” Defendant cites to the portion of the closing argument in which the State referred to the first sentencing hearing and pointed out that neither the cousin nor the brother had testified. It went on:

“What's so amazing and what's so incredible, is the child abuse situation that they described, this is a situation that is so terrible according to the witnesses, so bad, that it was even known outside of the household. Yet, at a time when you would expect these people to either come in or to testify in his behalf and describe something that would assist him like that, they didn't do it. They didn't even tell the lawyers. You have got to examine that, because that's very important. It doesn't make sense. It does not make sense. George and Donald never bothered to tell his lawyers and anyone else. ***

*** [T]here are four people, four people who you would expect would have knowledge of the child abuse situation. They were either in court talking to the lawyers, or somehow associated with the case. Now, here's a situation, 1995 comes rolling around and we've got Lawrence Jackson here again. Now, we've got new lawyers, one of which is Martha Fitzsimmons, and we've got a new strategy, but there is a problem here, the defense had a problem because how do you explain the fact that no one said that in 1988, how do you explain that? That didn't come up then that nobody talked about child abuse in court or to the lawyers then. Well, we learned that the lawyer in this case, Martha Fitzsimmons interviewed these various witnesses, all the witnesses, in fact who talked about child abuse. In fact, one of the witnesses said that Martha Fitzsimmons approached her and asked her to corroborate evidence of child abuse. The defense puts their strategy together and they bring in two new witnesses who never testified before.”

Defendant objected to this argument, and the objection was overruled. Defendant also included this objection in his post-trial motion.

The State argues simply that its argument mirrored the evidence. It points to Alicia Jackson's testimony that, before the second sentencing hearing, defense attorney Fitzsimmons approached her and asked her to “corroborate” what defendant's cousin and brother had told her about the abuse defendant suffered as a child. Alicia testified that she initially refused. After speaking occasionally with Fitzsimmons over a period of several months, Alicia testified at the second sentencing hearing that defendant had indeed been abused. On the basis of this evidence, the State argues, its argument was well within the wide latitude allowed prosecutors in closing arguments.

Defendant argues first that it is improper to accuse defense counsel of misconduct before a jury, citing 
People v. Emerson
, 97 Ill. 2d 487, 497 (1983). In 
Emerson
, this court noted the rule that “
[u]nless based on some evidence
, statements made in closing arguments by the prosecution which suggest that defense counsel fabricated a defense theory, attempted to free his client through trickery or deception, or suborned perjury are improper. [Citations.]” (Emphasis added.) 
Emerson
, 97 Ill. 2d at 497. To the extent that the State accused defense counsel of misconduct in the present case, such accusations were in fact based on the evidence. There were only two references to Fitzsimmons in the portion of the argument to which defendant refers. First, the State argued, in the second sentencing hearing, “we've got new lawyers *** and we've got a new strategy, but there is a problem here, the defense had a problem because how do you explain the fact that no one [testified to the abuse] in 1988?” This argument is based on evidence in the case. The only witness who testified in 1988 (Alicia) conceded at the second sentencing hearing that she had previously not testified about child abuse. Moreover, even defendant recognized that this change in Alicia's testimony had to be explained, because he offered evidence through Alicia as to why she had not previously testified about abuse. It is also true, as defendant argues, that Alicia Jackson did attempt to explain why her testimony had changed on direct examination. Defendant was free to rely on this explanation in his closing argument. However, the State was similarly free to question the explanation in its closing.

Second, the State said that Fitzsimmons interviewed the witnesses, and asked Alicia to “corroborate evidence of child abuse. The defense puts their strategy together and they bring in two new witnesses who never testified before.” This argument was also supported by the evidence: Alicia testified on direct examination that Fitzsimmons asked her to corroborate these stories of child abuse, and she initially refused. Moreover, defendant did offer the testimony of two witnesses (the cousin and the brother) who did not testify at the first trial. Therefore, to the extent that the State suggested that defense counsel committed some misconduct, we find that these arguments were within the wide latitude allowed the State in closing arguments, because the arguments fell within the realm of evidence presented and inferences that could reasonably have been drawn from that evidence. See, 
e.g.
, 
People v. Hudson
, 157 Ill. 2d 401, 441 (1993).

The parties also disagree about the State's references to the testimony of Dr. Gelbort in its closing. However, defendant did not raise these arguments in his primary brief, and was quite clear in his reply brief that he is not basing any appellate argument on those comments. Therefore, we need not consider the propriety or impropriety of the State's arguments with regard to Dr. Gelbort's testimony.

X. Admission of Prison Records and Disciplinary Reports

Defendant next argues that the admission of his prison records, including the disciplinary reports regarding defendant's conduct while in prison, was erroneous because those records were unreliable, and because their admission violated the eighth amendment, the due process clause of the fourteenth amendment, and the confrontation clause of the sixth amendment. The State argues that, under numerous decisions of this court, the State is permitted to introduce evidence of this sort in a capital sentencing hearing.

We will first consider defendant's arguments based on the sixth, eighth, and fourteenth amendments. First, we note that defendant does not explain any basis for his eighth amendment challenge. Second, we note that it is well settled that the introduction of hearsay evidence in a capital sentencing hearing violates neither the due process clause (
People v. Jones
, 94 Ill. 2d 275, 286 (1982)), nor the confrontation clause (
People v. Brown
, 172 Ill. 2d 1, 49 (1996)). Therefore, the arguments based on the sixth and fourteenth amendments also fail.

In fact, “evidence is admissible as long as it is both relevant and reliable.” 
Brown
, 172 Ill. 2d at 49. Defendant does not argue that any evidence which was admitted was not relevant. Thus, the only question for us is whether evidence which was not reliable was introduced at defendant's sentencing hearing. Defendant points to evidence which he argues should not have been admitted because they were unreliable.

First, defendant claims that the report that he defendant “attempted to incite a riot among the Vice Lords” in the county jail was unreliable. We have above held that the admission of that report was, at most, harmless error. See part VI 
supra
. Second, defendant claims that the April 29, 1991, memo from Lieutenant Josh Shettleworth to Louis Lowery about the defendant's April 20, 1991, assault on Officer Althiser was unreliable. Specifically, defendant claims that the memo was “vague and conclusory, and Utley [the witness through whom the memo was admitted] had no knowledge of it.” These arguments are irrelevant. The two requirements for the admissibility of evidence at a capital sentencing hearing are relevance and reliability. Defendant fails to point to any aspect of this memo which tends to show that it is either not relevant or unreliable. Indeed, it refers to an incident–the assault of Officer Althiser–which is documented by another piece of the evidence (the disciplinary report of the assault) which defendant does not attack as unreliable. Thus, we find no error in the admission of this evidence.

Third, defendant claims that “[t]he report on the gang literature was unsupported by the literature itself or the person who saw it.” Defendant also points out that the State “could not produce the [gang] literature at sentencing.” In fact, the State introduced two disciplinary reports regarding defendant's possession of gang literature. According to a 1987 report, defendant had a copy of the Vice Lords prayer in his cell. That copy of the prayer was introduced and admitted at defendant's sentencing hearing. According to a 1993 report, a letter containing gang literature was found in defendant's cell. This letter was not introduced. Since defendant complains that the report regarding gang literature should not have been admitted because the literature itself could not be produced, we assume that he complains only of the admission of the 1993 report.

We do not think that the admission of that 1993 report was erroneous. Defendant argues that the report is “unsupported by the literature itself or the person who saw it.” While defendant is correct, this fact alone does not render the report unreliable or inadmissible. Defendant was free to argue to the jury that the State's failure to introduce the literature should lead the jury to disregard this specific report. However, the fact that the literature was not preserved does not mean that this report was inadmissible. Similarly, the State's failure to produce the person who wrote the report does not render the report inadmissible. We have long held that a prison custodian of records may introduce prison records at sentencing, even where the officers who wrote the reports do not testify. See, 
e.g
., 
People v. Fair
, 159 Ill. 2d 51, 90 (1994). This is what has happened here. The reports are admissible, despite the fact that the authoring officers did not testify.

XI. Defendant's Sentence Relative to His Codefendant's

Defendant next argues that his death sentence is unreasonably disparate from his codefendant's life sentence. He bases this argument on the fact that he and Driskel had similar backgrounds; that Driskel had committed a prior murder and defendant had not; that Driskel was the “moving force” behind the instant offenses; and that Driskel's actions in committing the four murders and one attempted murder are more deserving of punishment than defendant's. Moreover, defendant argues, we should now consider the question of disparity, despite the fact that we considered and rejected this argument in defendant's direct appeal of his first death sentence, because (1) new evidence was offered in mitigation at the second sentencing hearing; (2) our prior decision was “based in significant part on misstatements of facts”; and (3) our prior decision was based on Driskel's “unreliable testimony in a separate proceeding, in conflict with this court's own decisions and the constitution.” The State argues that we should not revisit this issue because we considered and rejected it in defendant's first appeal and the defendant's proffered reasons for revisiting the issue are meritless. Thus, the first question before us is whether to consider this disparity argument at all, in light of our prior rejection of it. Accordingly, we first consider the scope of that prior holding.

In defendant's first appeal, he argued that his death sentence was “unreasonably disparate” from Driskel's for two reasons: (1) he argued that Driskel's background “contained more aggravation” than his own; and (2) he claimed that Driskel was at least as culpable as he in the murders at the Horner Homes. We rejected both points. On the question of the background of each, we noted that each had two prior felony convictions; that each had been arrested and had charges dropped; that there had been some testimony Driskel had committed a murder as a juvenile; that both were drug addicts, and that Driskel had sought admittance to a drug treatment program and been denied, while defendant had never sought treatment; that Driskel had been physically abused as a child, while defendant's father had deserted the family when the children were young; and that defendant had seen his brother killed, while Driskel had been given an overdose of LSD by a teacher and twice been hospitalized for psychotic behavior. 
Jackson
, 145 Ill. 2d at 120.

We noted a large distinction between the prison record of each. Driskel's prison record, while “not impeccable, *** was far better than defendant's.” 
Jackson
, 145 Ill. 2d at 120. Driskel had been disciplined on a few occasions, but had also received his GED during his first incarceration and left Joliet with “highest status, Grade A.” 
Jackson
, 145 Ill. 2d at 121. He later took college courses and completed a program in truck driving. “While awaiting trial in this case, Driskel attended classes and counseled with a minister. Driskel displayed a propensity for self-improvement.” 
Jackson
, 145 Ill. 2d at 121. This last characteristic was also demonstrated by his ability to hold down a job. 
Jackson
, 145 Ill. 2d at 121. In contrast, defendant had been cited for 53 disciplinary violations while incarcerated for two years in 1981-83. 
Jackson
, 145 Ill. 2d at 121. These included numerous serious offenses, including possession of weapons, attempted assaults on corrections officers, and making physical threats to jail employees. 
Jackson
, 145 Ill. 2d at 121-22. This same behavior–most of which is documented in the facts stated in the opinion in defendant's first appeal and in this opinion–continued when defendant was incarcerated in the Cook County jail in 1986-87. We noted that defendant never expressed an interest in improving his mind, never took classes in prison, and never held a job. In sum, we found that, “[d]espite some evidence that he had killed someone earlier in his life–a factor not to be lightly regarded–Driskel's background is not so dominated by violence and threats of violence as is the case with defendant. *** A rational distinction can thus be drawn between Driskel's situation and defendant's.” 
Jackson
, 145 Ill. 2d at 124.

On the question of relative culpability, we noted that defendant claimed and continues to claim that Driskel “was at least as culpable as he,” and that Driskel was “the moving force in the commission of the offense.” We noted that there “was significant evidence to the contrary, indicating defendant may have been the instigator.” Defendant's own statements showed that he had been in possession of the knives used in the offense, and gave Driskel a knife outside the apartment door. As Driskel stood near Brown, defendant asked Driskel, “What are you going to do?” We found that this statement could be interpreted as either a genuine question, or as an exhortation to Driskel to proceed. We noted that it was defendant who forced open the door to the bedroom where the other victims were hiding. We found that these facts “seem[ed] consistent with evidence presented in support of Driskel's defense of compulsion which, while not a proper defense to the murders, was nonetheless submitted to the jury for consideration on the other charges.” 
Jackson
, 145 Ill. 2d at 125. This evidence included Driskel's testimony that defendant had stabbed him a month before the murders; the fact that defendant was the much larger man of the two; Driskel's testimony that he intended to burgle Brown's apartment if no one was home, but that defendant prompted him to proceed once it was clear that people were home and, to that end, handed him a knife, and ordered him to commit various acts once inside the apartment; Driskel's sister's testimony that Driskel is a follower who would do what defendant told him to do; and Driskel's testimony that he moved the baby, Shonita, to a bedroom to keep her from being harmed. On the basis of all of this evidence, we found that the evidence in the record could account for the disparate sentences of defendant and Driskel, and that defendant's sentence was thus not “unreasonably disparate.”

Defendant now urges us to revisit this issue, because new mitigation evidence was presented, and because our conclusion in the first opinion was based both on misstated facts and on Driskel's unreliable testimony. Where a defendant appeals, the reviewing court remands, and the defendant appeals again, the issues which that defendant may raise on the second appeal are limited to those which arose in the remand proceedings. 
People v. Janes
, 168 Ill. 2d 382, 387 (1995). This rule prevents defendant from arguing that our conclusions were incorrect based on evidence which was before us in his first appeal, such as the evidence that Driskel may have committed a murder as a juvenile. However, the same rule would certainly allow defendant to renew his disparity argument based on evidence introduced only at his second sentencing hearing, such as his evidence of being physically abused as a child. Nevertheless, while we are willing to reexamine our conclusion that defendant's sentence is not unreasonably disparate from Driskel's in light of this mitigation evidence, we do not reach a different conclusion. Like defendant, Driskel was also beaten as a child. As we found before, both Driskel and defendant had similar backgrounds. We noted two key differences between the two men. First, Driskel had shown some willingness to improve himself, while defendant had not, and Driskel's disciplinary record while in prison was much better than defendant's. Second, it seemed more likely than not that defendant was the “leader” in the commission of these four murders, and Driskel was the “follower.” The evidence that defendant was beaten as a child, while not insignificant, does not change either our conclusion that defendant's background shows more violence than Driskel's, or that defendant was more likely the “leader” in the commission of these crimes. Thus, based on these two factors, we again find that defendant's sentence was not unreasonably disparate from Driskel.

Defendant argues that we should revisit our previous conclusion on the question of disparity because we relied on misstatements of facts in the first appeal. Defendant points to a number of supposed inaccurate factual statements contained in our first opinion. Most of these inaccuracies are quite minor. For instance, defendant argues that we incorrectly stated that he had not sought treatment for drug addiction when he had; that we found that defendant had “never expressed an interest in improving his mind,” when he had actually earned his GED while in prison; and that we stated that defendant had never held a job, while we ignored the fact that defendant might not be able to hold a job because of his claim that he had abnormal brain functions. Even if the statements of which defendant complains were inaccurate, the corrections which defendant suggests are so minor that they would not cause us to alter our conclusion that the record contains some rational justification for the disparate sentences. For instance, defendant's prison record–which was significantly worse than Driskel's at the time of his first sentencing hearing–has gotten even worse. Since that first sentencing hearing, defendant has continued his violent behavior, which has included numerous assaults on corrections officers, numerous threats to officers, two incidents in which he masturbated while looking at female guards, one incident in which he threw feces at a guard, numerous times at which defendant was found to possess weapons, and one incident in which he actively participated in a jail riot. Knowles testified at defendant's second sentencing hearing that he had come into contact with about one thousand prisoners, and that defendant ranked fourth among them in terms of dangerousness. This difference in the conduct of each defendant is sufficient to justify the disparity between the sentences. Defendant also argues that we did not sufficiently weight the evidence of Driskel's involvement in a murder as a juvenile. In fact, we clearly considered this evidence in defendant's first appeal (see 
Jackson
, 145 Ill. 2d at 124), so we will not revisit our conclusion based on that evidence.

Finally, Defendant urges us to reconsider our conclusion based on our own supposed misstatements of the law. This argument is based on our consideration of Driskel's statements in support of his claim that defendant coerced him to participate in these crimes. Defendant argues that Driskel's claims of compulsion are “unreliable,” citing to numerous cases in which we have held that a codefendant's self-serving statements in which he minimizes his own involvement in the crimes are “presumptively unreliable.” See 
People v. Turner
, 128 Ill. 2d 540, 567 (1989); 
People v. Rogers
, 123 Ill. 2d 487, 521-22 (1988). In 
Turner
, this court described these cases as holding that such statements are “presumptively unreliable and should not be admitted into evidence, unless sufficient indicia of reliability exist to overcome the presumption.” 
Turner
, 128 Ill. 2d at 567. Thus, the question is whether Driskel's statements were supported by “sufficient indicia of reliability,” so that we were correct in relying upon them in our prior ruling.

It is true that there are inconsistencies between Driskel's testimony and both the testimony of Urica Winder and defendant's statements to the assistant State's Attorney. However, even if we were to disregard Driskel's testimony altogether, we would still conclude that defendant's sentence is not unreasonably disparate from Driskel's. Indeed, in our opinion in defendant's first appeal, we found that defendant's background showed much more of a propensity for violence than Driskel's. In the time since that appeal, that distinction between Driskel and defendant has become more stark, as defendant's behavior in prison has continued to get worse. Therefore, we find that defendant's sentence is not unreasonably disparate.

XII. Trial Court's Exclusion of Evidence of Codefendant's Life Sentence

Defendant next argues that the trial court erred in granting the State's motion to bar evidence of Driskel's sentence of life imprisonment. Defendant argues that the eighth amendment requires that a defendant at a capital sentencing be allowed to introduce evidence of a codefendant's sentence. This position is contrary to our oft-stated holding that a defendant does not have a right to present evidence of a codefendant's lesser sentence. Such evidence is “neither constitutionally required nor relevant to the jury's examination of the individual defendant's characteristics and the circumstances of his offense.” 
People v. Page
, 156 Ill. 2d 258, 270 (1993). While a reviewing court might consider whether a death sentence is unreasonably disparate from the sentence imposed on a codefendant, a defendant does not have a right to present evidence of the codefendant's sentence to the sentencing jury. 
Page
, 156 Ill. 2d at 270-71. The trial court did not err in excluding the evidence of Driskel's sentence.

Defendant argues that we should consider this court's ruling in 
Page
, in light of the United States Supreme Court's opinion in
 Parker v. Dugger
, 498 U.S. 308, 112 L. Ed. 2d 812, 111 S. Ct. 731 (1991). In 
Parker
, the Court merely took note of the Florida Supreme Court's holding that evidence of a codefendant's lesser sentence is nonstatutory mitigating evidence; it did not find that defendants have a constitutional right to the admission of such evidence. See 
Parker
, 498 U.S. at 315, 112 L. Ed. 2d at 822, 111 S. Ct. at 736, citing 
Norris v. State
, 429 So. 2d 688, 690 (Fla. 1983). In fact, in 
Page
, we took note of the fact that the Florida Supreme Court had held that a codefendant's sentence was nonstatutory mitigating evidence, and we explicitly refused to reach the same conclusion. 
Page
, 156 Ill. 2d at 272. Therefore, the Court's opinion in 
Parker 
does not affect our holding that a defendant does not have a right to present evidence of a codefendant's lesser sentence to a sentencing jury.

XIII. Illinois Pattern Death Penalty Instructions Violate the Eighth and Fourteenth Amendments Because They Are Confusing and Misleading

Defendant next argues that “the Illinois Pattern Death Penalty Instructions are so confusing and misleading to jurors that they violate due process of law and the eighth amendment.” Defendant relies on the studies of Professor Hans Zeisel and Professor Shari Diamond in arguing that we should remand the case for an evidentiary hearing on the fairness of the instructions. As defendant notes, we considered and rejected this argument in 
People v. Brown
, 172 Ill. 2d 1, 55-57 (1996). We will not reconsider our decision in 
Brown
.

XIV. The Death Penalty Statute's Use of the Phrase “Sufficient to Preclude” Precludes Meaningful Consideration of Mitigation

Defendant last argues that one portion of the death penalty statute (720 ILCS 5/9–1(g) (West 1994)) violates the eighth and fourteenth amendments of the United States Constitution. The section defendant complains of states in relevant part:

“If at the separate sentencing proceeding the jury finds that none of the [aggravating] factors set forth in subsection (b) exists, the court shall sentence the defendant to a term of imprisonment ***. If there is a unanimous finding by the jury that one or more of the factors set forth in subsection (b) exist, the jury shall consider aggravating and mitigating factors as instructed by the court and shall determine whether the sentence of death shall be imposed. If the jury determines unanimously that there are no mitigating factors sufficient to preclude the imposition of the death sentence, the court shall sentence the defendant to death.” 720 ILCS 5/9–1(g) (West 1994).

Defendant argues that this language of the statute requires that a defendant receive the death penalty unless mitigation is “sufficient to preclude” its imposition, in violation of United States Supreme Court precedent. Specifically, defendant notes that the United States Supreme Court has held constitutional a death penalty scheme in which a State proves that some aggravating circumstance exists, and then the “burden of proving mitigating circumstances sufficiently substantial to call for leniency” to the defendant. 
Walton v. Arizona
, 497 U.S. 639, 650, 111 L. Ed. 2d 511, 526, 110 S. Ct. 3047, 3055 (1990). Defendant argues that the Illinois sentencing scheme goes far beyond that scheme in that it places a much larger burden on the defendant. Specifically, he argues, the Illinois scheme is different because it requires that defendant to prove mitigating evidence “sufficient to preclude” the imposition of the death sentence, and “preclude” means “to make impossible.” Thus, defendant argues, the Illinois death penalty statute unconstitutionally places a much larger burden on the defendant than the statute held constitutional in 
Walton
.

We disagree. In 
People v. Bean
, 137 Ill. 2d 65 (1990), the defendant argued that section 9–1(g) unconstitutionally placed a burden of persuasion on the defendant “to persuade the jury that he should not be sentenced to death owing to mitigating circumstances.” 
Bean
, 137 Ill. 2d at 138. In response to this argument, we restated our prior holdings that the death penalty statute does place a burden of persuasion on the defendant, but the burden is not unconstitutional. 
Bean
, 137 Ill. 2d at 139. We also noted that this burden is placed on the defendant only after the State has already proven the elements of a statutory aggravating factor beyond a reasonable doubt. 
Bean
, 137 Ill. 2d at 139. Moreover, we noted that the defendant does not solely bear the burden of persuasion at the balancing stage, that the State as the movant “bears the primary burden of persuading the jury that, as the statute states, there are no mitigating factors sufficient to preclude the sentencer from imposing the sentence of death for which the defendant is eligible.” 
Bean
, 137 Ill. 2d at 139. In sum, we stated:

“We note also that because this is a process of balancing intangibles, not of proving facts, it is improper to speak of defendants as having a `burden.' After the State as movant has attempted to persuade the jury that death sentence should be imposed, a defendant may attempt to dissuade the jury from doing so. Whether defendant attempts to dissuade the jury, whether he decides to take up this `burden,' is up to him; the law does not require him to take it up.

By the same logic, we hold that the death penalty statute does not unconstitutionally create a presumption that death is the appropriate penalty; instead, it requires the State first to prove that a defendant is eligible for the death penalty, and then to persuade the jury that, given the aggravating and mitigating factors presented, death is the appropriate penalty.“ 
Bean
, 137 Ill. 2d at 140.

We adhere to our holding in 
Bean 
that a defendant bears only a burden of persuasion, and only after the State has carried its burden of persuading the jury that, considering all of the aggravating and mitigating evidence, the defendant should receive the death penalty. Therefore, under the statute, the defendant's burden is no greater than that held constitutional in 
Walton
. The United States Court of Appeals for the Seventh Circuit, also relying on our decision in 
Bean
, has reached the same conclusion. See 
Silagy v. Peters
, 905 F.2d 986, 998-99 (7th Cir. 1990).

CONCLUSION

Defendant was found eligible for the death penalty on the basis of three statutory aggravating factors: he was found guilty of one count of multiple homicide, one count of the murder of a child under the age of 12 in a brutal and heinous fashion, and three counts of felony murder. We have above found that at least one of the verdicts of eligibility was proper, without judging the validity of the other verdicts. A finding of eligibility based on more than one statutory aggravating factor may be upheld where one (or more) of the factors is later invalidated, as long as a “separate, valid aggravating factor supported eligibility.” 
People v. Brown
, 169 Ill. 2d 132, 165 (1996) (citing 
People v. Page
, 156 Ill. 2d 258, 268 (1993), and 
Zant v. Stephens
, 462 U.S. 862, 880-90, 77 L. Ed. 2d 235, 252-58, 103 S. Ct. 2733, 2744-50 (1983)). Thus, we conclude that the defendant was eligible for the death penalty. We also reject each of defendant's other challenges to his death sentence.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed. We direct the clerk of this court to enter an order setting Wednesday, September 23, 1998, as the date on which the sentence of death, entered by the circuit court of Cook County, shall be carried out. Defendant shall be executed in the manner provided by law. 725 ILCS 5/119–5 (West 1994). The clerk of this court shall send a certified copy of the mandate in this case to the Director of Corrections, the warden of Stateville Correctional Center, and the warden of the institution where defendant is confined.

Affirmed
.